# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| David Frank, individually and on behalf of all others similarly situated,<br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>Trilegiant Corporation, Inc.; Affinion Group, LLC; Apollo Global Management, LLC; 1-800-Flowers.com, Inc.; Beckett Media LLC; Buy.com, Inc.; Classmates International, Inc.; Days Inns Worldwide, Inc.; FTD Group, Inc.; Hotwire, Inc.; IAC/InterActiveCorp; Memory Lane, Inc.; Orbitz Worldwide, LLC; PeopleFindersPro, Inc.; Priceline.com, Inc.; Shoebuy.com, Inc.; TigerDirect, Inc.; United Online, Inc.; and Wyndham Worldwide Corporation; Bank of America, N.A.; Capital One Financial Corporation; Chase Bank USA, N.A.; Chase Paymentech Solutions, LLC; Citibank, N.A.; Citigroup, Inc.; and Wells Fargo Bank, N.A.,<br><br>　　　　　　　　Defendants. | Civil Action No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE .............................................................. 13

III. PARTIES ............................................................................................ 14

    A. The Plaintiff .............................................................................. 14

    B. The Defendants ........................................................................ 15

        1. The Trilegiant Defendants ............................................... 15

        2. The Defendant Credit Card Companies ........................... 16

        3. The E-Merchant Defendants ............................................ 17

IV.  STATEMENT OF FACTS .................................................................... 20

    A. Trilegiant Has A History Of Preying Upon Consumers In Conjunction With The E-Merchant Defendants ................... 20

    B. Trilegiant, In Conjunction With Various Credit Card Companies And E-Merchants, Morphed Its Business Practices Into Yet Another Fraudulent Marketing Scheme To Sell Its Membership Programs To Consumers..... 25

    C. Despite Their Awareness Of Trilegiant's Fraudulent Scheme, The Defendant Credit Card Companies Continue To Process Fraudulent Charges .................................................................. 32

    D. In Addition To Processing Fraudulent Charges, The Defendant Credit Card Companies Actively Promoted The Scheme……...43

    E. Trilegiant And The E-Merchant Defendants Are Fully Aware Of The Consumer Complaints Caused By Their Fraudulent Scheme, Which Generated Billions Of Dollars In Revenue ..... 45

    CLASS ACTION ALLEGATIONS ........................................................ 58

    PRAYER FOR RELIEF ....................................................................... 84

Plaintiff, David Frank ("Plaintiff"), individually and on behalf of all others similarly situated, alleges, based upon personal knowledge, information and belief, and the investigation of counsel, the following:

## I.     NATURE OF THE ACTION

1.     This action is brought to redress the shocking behavior of some of this country's largest companies, which have combined and conspired to defraud hundreds of thousands of consumers into paying for "club" memberships and subscription services that the consumer never authorized. Each participant in this scheme profited handsomely from its participation, and each participant knew that the particulars of the scheme would result in consumers being defrauded.

2.     The "cramming" of charges for unwanted memberships and services that is the subject of this lawsuit has already been determined by the United States Senate Committee on Commerce, Science and Transportation (the "Senate Commerce Committee") and New York Attorney General, after extensive investigation, to be a fraud. The Senate Commerce Committee Report entitled, "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers," which was published on November 16, 2009 ("Senate Report"), concluded that this alleged fraudulent scheme "exploit[s] shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand that they have purchased. Hundreds of e-commerce merchants – including many of the best known, respected websites and retailers on the internet – allow these []

1

companies to use aggressive sales tactics against their customers, and share in the revenues generated by these misleading tactics." (Senate Report at 30.) What occurred, and continues to occur, is white collar racketeering, plain and simple.

3.       The scheme was initiated by Defendant, Trilegiant Corporation, Inc. ("Trilegiant"), its parent company, Defendant, Affinion Group, LLC ("Affinion"), and their controlling owner, Defendant, Apollo Global Management, LLC ("Apollo") (collectively, "Trilegiant"), but the scheme also required Internet e-commerce merchant partners and the willing participation of credit card companies.  Trilegiant colluded, and continues to collude, with Defendants, 1-800-Flowers.com, Inc. ("1-800-Flowers"); Beckett Media LLC ("Beckett"); Buy.com, Inc. ("Buy.com"); Classmates International, Inc. ("Classmates"); Days Inns Worldwide, Inc. ("Days Inns"); FTD Group, Inc. ("FTD"); Hotwire, Inc. ("Hotwire"); IAC/InterActiveCorp ("IAC"); Memory Lane, Inc. ("Memory Lane"); Orbitz Worldwide, LLC ("Orbitz"); PeopleFindersPro, Inc. ("PeopleFinder"); Priceline.com, Inc. ("Priceline"); Shoebuy.com, Inc. ("Shoebuy.com"); TigerDirect, Inc. ("TigerDirect"); United Online, Inc. ("United Online"); and Wyndham Worldwide Corporation ("Wyndham") (collectively, "E-Merchant Defendants") and Defendant credit card companies, Bank of America, N.A. ("Bank of America"); Capital One Financial Corporation ("Capital One"); Chase Bank USA, N.A. ("Chase"); Chase Paymentech Solutions, LLC ("Paymentech"); Citibank, N.A. ("Citibank"); Citigroup, Inc. ("Citigroup"); and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, "Defendant Credit Card Companies"), to

facilitate the scheme, the purpose of which was to levy unauthorized charges on consumers' credit or debit card accounts.

4.      Trilegiant started the scheme by creating so-called "membership" and discount "clubs" with titles such as AutoVantage, Buyers Advantage, CardCops, CompleteHome, Everyday Privileges Gold, Everyday Values, HealthSaver, Great Fun!, Great Options, Hot-Line, IdentitySecure, Just For Me, LiveWell, PC Safety/Plus, Privacy Guard, Shoppers Advantage, and Travelers Advantage ("Membership Program(s)").  Trilegiant sold these products, which have no real value, to consumers through an insidious set of business practices. Trilegiant carefully crafted its scheme to exploit known consumer tendencies in order to create consumer confusion and ultimately defraud consumers into paying "membership" fees to such "clubs" for which the consumers never even realize they signed up.

5.      Trilegiant's business practices are well known to the E-Merchant Defendants (as well as the broader e-merchant community) and Defendant Credit Card Companies, each of which is an essential part of Trilegiant's fraudulent scheme.  Trilegiant requires the complicity of the E-Merchant Defendants for its scheme to succeed, and Trilegiant pays them handsomely to participate in the scheme to defraud.  Trilegiant secures the participation of the E-Merchant Defendants by contracting with them to approve Trilegiant's practice of interpolating itself into the checkout process when consumers, such as Plaintiff, are completing an online purchase.  As explained by the Senate Report, "[i]n exchange for bounties or other payments, reputable on-line retailers agree to let

3

Affinion [] sell club memberships to consumers as they are in the process of buying movie tickets, plane tickets or other online goods and services. The sales tactics used . . . exploit consumers' expectation about the online 'checkout' process." (Senate Report at i.)

6.     Trilegiant pays substantial "bounties" and other amounts to the E-Merchant Defendants. For example, Priceline received an upfront lump sum payment of over $1 million just to let Trilegiant in the door, and then collected a sizable percentage of each dollar Trilegiant collected from Priceline customers. The aggregate of the fees "earned" by the E-Merchant Defendants is staggering: – Congressional records indicate that Trilegiant paid Memory Lane (operating its business as Classmates.com) in excess of $70 million.  Trilegiant paid other Defendants, including 1-800-Flowers and FTD, at least $10 million as their share of the fraudulent racketeering scheme.

7.     The E-Merchant Defendants are not merely passive participants in the fraudulent scheme.  The E-Merchant Defendants retain final approval over what Trilegiant shows the customer in the midst of the E-Merchant Defendants' checkout process, and contracts allow the most facially deceptive aspects of the scheme: the post-transaction offer, the passive datapass, and negative option billing.

(a)     Post-Transaction Offers: As is common in internet sales transactions, when a consumer is ready to complete his or her purchases from an E-Merchant Defendant, he/she is prompted to input his or her confidential billing information, including his or her credit or debit card number.  After this, but

4

before confirming the sales transaction with an E-Merchant Defendant, Trilegiant inserts its Membership Program offer with the promise of an upfront gift, such as cash-back rewards. Because of the positioning of this "post transaction offer" in the purchase process, the consumer is led to believe that he or she is completing the original transaction with an E-Merchant Defendant.

(b)     Datapass: At the heart of Defendants' fraudulent marketing scheme lies a "datapass" arrangement, where a consumer is enrolled, unwittingly, in a Trilegiant Membership Program without ever directly providing his/her credit card information. Instead, an E-Merchant Defendant, pursuant to its partnership agreement with Trilegiant, passes on the consumer's credit card information to Trilegiant, without the consumer's knowledge or consent, and without any form of communication between an E-Merchant Defendant and the consumer authorizing this "datapass." Of course, there is nothing hidden about this arrangement. Each E-Merchant Defendant was given a document, entitled "Datapass – Token Customer Interface," which sets forth the requirements to facilitate the datapass. According to this document, it is "the starting point for implementation discussions needed to begin the joint integration design and construction effort between Affinion and Partner." The Affinion Group Datapass document provided to the E-Merchant Defendants explicitly states that "Affinion has an application interface named 'Datapass – Token' that allows external partners to offer their customers enrollment via a transaction website into any of Affinion's many membership clubs. . . .The information from the previous transaction on the partner site, such as name, address, and payment information,

5

is passed to Affinion via the partner to complete the enrollment transaction. The user does not need to re-key any personal information . . . ." (Tri_Schnabel 122755.)   As alleged fully below, as a result of a Senate investigation into Defendants' practices, Congress outlawed this practice by enacting the Restore Online Shoppers' Confidence Act.

          (c)     <u>Negative Option Billing</u>: Once the consumer is unwittingly enrolled in one or more of Trilegiant's Membership Programs, Trilegiant begins to automatically charge the consumer's credit or debit card, again without the consumer's authorization.  The Defendant Credit Card Companies then process these unauthorized charges and debits the consumer's account, despite the evidence that Trilegiant is in violation of numerous credit card rules.  Trilegiant continues assessing, and the Defendant Credit Card Companies continue processing, these unauthorized charges until the consumer actively opts out of the Membership Program, if at all.  Indeed, the lack of consumer awareness of having incurred unauthorized charges is so widespread that Trilegiant has trained its call center employees as to what to do "when a member is questioning the membership charge on their bill that they know nothing about." (Tri_Schnabel 027027.)  This practice is known as a "negative option" and results in Trilegiant charges of $11.99 or more per month.  As with the practice of datapass, Congress outlawed this practice by passing the Restore Online Shoppers' Confidence Act.

       8.     The E-Merchant Defendants are also complicit in Trilegiant's insidious use of a practice known as "refund mitigation," which seeks to keep as

much of the money the consumer unwittingly paid after a consumer discovers the fraud on his or her credit card statements.  Trilegiant, knowing that a consumer will attempt to seek immediate cancellation, as well as a full refund, upon discovering that he or she was unwillingly enrolled in these Membership Programs and charged unauthorized monthly fees, employs various tactics to minimize the amount of refund to be issued to the consumer.  These tactics include training call center employees to quickly cancel without a refund as soon as a customer complains, and demanding that the request for cancellation be in writing.  The scripts used are shared with the E-Merchant Defendants, who select how many "rebuttals" the call center employee may pitch during the cancellation process.  E-Merchant Defendants are even flown out to the main Trilegiant call center to listen to call center employees as they follow the fraudulent scripts. Trilegiant treats the customer calling in to cancel after they detect the fraud on their credit card bill as a marketing opportunity.  Trilegiant instructs its trainee call service representatives that "[a]t Affinion Group, a consultant working an 8-hour shift will take between 75-100 calls.  On high call volume days, this number may be even higher.  Approximately 80% of these calls will be from members wishing to cancel their membership.  Your job will be to convince them, based on the merits of the programs and the benefits, to retain their membership." (Tri_Schnabel 026620.)  To translate this into the context of the scheme, the sales representatives are trained to do what Trilegiant fails to do when the customer allegedly "signs up" for the Trilegiant membership club – get the customer's assent to have their card charged and become a member of the "club."

7

9.     The E-Merchant Defendants are not innocent recipients of the funds. They are involved in or have knowledge of each step of the process; they clearly know about the use of the datapass and the confusing nature of the Trilegiant "pop up" window in the checkout process; and they were, and are, aware of and complicit in the refund mitigation component of the scheme. Defendant Affinion, in its Form 10-K for the 2010 fiscal year, noted under "risk factors" that "[W]e [Affinion] rely on our marketing partners [including E-Merchant Defendants] to provide limited customer information to us for certain marketing purposes and to approve marketing materials. If our marketing partners make significant changes to the materials that decrease results, or if they limit the information that they provide to us, our ability to generate new customers may be adversely affected." (Affinion March 3, 2011 Form 10-K at 28.) Affinion, in the same Form 10-K, admits that "[o]ur marketing efforts are *largely dependent* on obtaining approval of the solicitation materials from our marketing partners." (*Id.*; emphasis added.) Each of the E-Merchant Defendants are, in Affinion's own words, active participants in the selection and design of the fraudulent marketing process.

10.     The Defendant Credit Card Companies are equally critical and complicit in the fraudulent scheme. If they refused to process the credit card transaction, or flagged it as a potentially fraudulent transaction to the card member, the scheme would fail miserably, since it relies greatly on consumer tendencies to not closely scrutinize credit card bills.

11.     The Defendant Credit Card Companies all employ extensive proprietary software programs to monitor fraud. None of them flagged charges

8

for the Trilegiant "clubs" as potentially fraudulent, despite specific knowledge of the fraud, which comes from at least two sources:

(a).    Many consumers call their credit card company with questions about a charge, and the fraud departments at the Defendant Credit Card Companies each have received *thousands* of inquiries from victims of Trilegiant schemes.  The Defendant Credit Card Companies knew there was rampant consumer belief in the fraudulent nature of these charges, yet they continued to process the charges anyway.

(b).    The Defendant Credit Card Companies are also knowledgeable because they are "partners" with Trilegiant.  According to Hoovers, "[o]f all of Affinion's thousands of partners, the company depends the most on Bank of America, Wells Fargo, and JPMorgan Chase; the three have been marketing with Affinion for over a decade, with Wells Fargo accounting for 11% of its overall revenue in 2010."[1]  Many customers of the Defendant Credit Card Companies were unwittingly enrolled in privacy or credit guard type programs that Chase, Bank of America, Capital One and Wells Fargo contracted to allow Trilegiant to "sell" to their card members.  In this context, the Defendant Credit Card Companies selected the number of rebuttals, were aware of the script, and were contractually required to conference in the Trilegiant call center to handle consumer complaints stemming from enrollment in these programs.  In this three way phone call, the Defendant Credit Card Companies' fraud department

---

[1] http://www.hoovers.com/company/Affinion_Group_Holdings_Inc/rryckif-1-1njhxf.html

9

employee was contractually required to remain silent on the line while the
Trilegiant call center employee tried to "sell" the product that was never "sold" to
the customer in the first place.  Thus, despite proclaiming their fraud monitoring
protections to card members, the Defendant Credit Card Companies actually
contracted with Trilegiant to exempt Trilegiant from fraud department scrutiny in
those circumstances in which the Defendant Credit Card Companies are the
merchant partner.

12.     The Defendant Credit Card Companies also knew that shutting down
the fraudulent scheme would cost them a lot of money.  The Defendant Credit
Card Companies earn a percentage of every charge Trilegiant processes, so the
more consumers are charged by Trilegiant, and the more times those charges are
made, the more money they make.  After Visa clarified its network rules, one
credit card industry observer noted it, stating that "Visa has voluntarily agreed to
stop its merchants from engaging in this [datapass] practice.  The only
conceivable reason they allowed it in the first place had to have been the cut they
took on those transactions."[2]

13.     The Defendant Credit Card Companies, consistent with their role as
marketing "partners" with Trilegiant (as discussed above), took an active role in
promoting or advertising the Membership Programs.  Chase, for example,
included promotional messages for several Membership Programs in the
"IMPORTANT NEWS" section of its customer statements.

---

[2] Geri Detweiler, "Visa Bans Datapass Marketing: What Took So Long?"
www.credit.com/blog/2010/05/visa-bans-datapass-marketing.  Ms. Detweiler is a
Personal Finance Advisor for Credit.com.

14.     Defendants are fully aware of the thousands of consumer complaints

regarding their fraudulent marketing scheme. In fact, the pattern of Defendants'

fraudulent conduct is so pronounced that various governmental authorities,

including the Senate Commerce Committee and then-New York Attorney General

Andrew M. Cuomo, launched official investigations into Trilegiant and its

affiliated e-merchants' online business practices.

15.     The Senate Report concluded:

Affinion[/Trilegiant] . . . use[s] aggressive sales tactics intentionally
designed to mislead online shoppers.     [Trilegiant] exploit[s]
shoppers' expectations about the online purchasing process to
charge millions of consumers each year for services the consumers
do not want and do not understand they have purchased. Hundreds
of e-commerce merchants – including many of the best-known,
respected websites and retailers on the Internet – allow [Trilegiant] to
use aggressive sales tactics against their customers, and share in
the revenues generated by these misleading tactics.

16.     The Senate Commerce Committee published a second report on May

19, 2010, entitled "Supplemental Report on Aggressive Sales Tactics on the

Internet" ("Supplemental Report"), based on the information provided by e-

merchants. The Supplemental Report concluded that the E-Merchant Defendants

engaged in deceptive conduct and violated credit card company rules by

automatically transferring customers' credit card information to Trilegiant.

17.     These investigations follow on the heels of the settlements Trilegiant

reached with 16 attorneys general in 2006 that required Trilegiant to cease certain

business practices, including offering "free" or "no obligation" trial memberships

in the same Membership Programs at issue here through direct mail solicitations,

without disclosing that cashing the enclosed check (for a nominal amount)

11

automatically enrolls the consumer in the Membership Program, and that the consumer will be charged automatic monthly fees until the consumer affirmatively acts to cancel. But, like a virus, Trilegiant mutated its business practices into their current form.

18.    As a result of Defendants' fraudulent marketing scheme, Plaintiff and members of the putative Class have been charged for "memberships" to Trilegiant Membership Programs that they never wanted or used, and which have little or no actual value.

19.    Accordingly, Plaintiff, on behalf of himself and all others similarly situated whose credit, debit or other accounts have been assessed "membership fee" charges as a result of Defendants' fraudulent scheme, brings these claims against Defendants for: (a) violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; (b) conspiring to violate RICO, 18 U.S.C. § 1962(d); (c) aiding and abetting violations of RICO, 18 U.S.C. §§ 1961-1968; (d) aiding and abetting violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344(2) (bank fraud); (e) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*; (f) aiding and abetting violations of ECPA, 18 U.S.C. § 2510, *et seq.*; (g) violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a ("CUTPA"); (h) aiding and abetting violations of CUTPA; (i) violations of the California Automatic Purchase Renewal Act, Cal. Bus. & Prof. Code § 17602; and (j) unjust enrichment. Plaintiff seeks, *inter alia*: an order certifying the proposed Classes under Rule 23 of the Federal Rules of Civil Procedure; an order

12

appointing Plaintiff and his counsel of record to represent the Classes; restitution, statutory damages, and injunctive and declaratory relief on behalf of Plaintiff and the Classes; and any such further relief as the Court may deem proper under the circumstances.

## II.   JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, namely, 18 U.S.C. §§ 1961-1968 (RICO) and 18 U.S.C. § 2510, *et seq.* (ECPA).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims for violations of CUTPA, and for unjust enrichment.

21.     This Court also has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because, in the aggregate, the amount in controversy exceeds the jurisdictional minimum amount of $5,000,000.00, exclusive of costs and interests; there are at least 100 members in the proposed Classes; and at least one member of each Class is a citizen of a different state than that of Defendants.

22.     This Court has general and specific jurisdiction over Defendants. Defendants are, and at all relevant times were, engaged in unfair business practices and a racketeering enterprise directed at and/or causing injury to persons residing, located or doing business throughout the United States, including in this District.  The jurisdiction is proper pursuant to RICO, 18 U.S.C. § 1965(b) that established nationwide jurisdiction in RICO claims.

13

23.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and/or because Defendants have sufficient contacts with this District.

### III.      PARTIES

#### A.      The Plaintiff

24.      Plaintiff David Frank is, and at all relevant times was, a citizen of Illinois.  Sometime before March 2009, Plaintiff made a purchase on 1-800-Flowers.com using a Chase Master Card.  In or about March 2009, the Chase Master Card was charged $11.99 by Trilegiant, with a transaction description of "TLG*LIVWEL15130916MAR".  All subsequent and identical monthly charges, which continued until September 2010, had the same transaction description except for what appears to be a description of the particular month the charge was assessed.  Plaintiff never used any of the purported benefits of the Membership Program.  Plaintiff noticed the recurring charges for the first time in or about July 2010 and promptly contacted Trilegiant to stop the charges.  Despite Plaintiff's repeated requests for a full refund, Trilegiant refused to provide a full refund for the months for which Plaintiff was unlawfully charged.

25.      At no point during Plaintiff's transactions with 1-800-Flowers, or at any point thereafter, did Plaintiff provide his consent to charge his Chase Master Card for allegedly enrolling in the Membership Program.  The charges were virtually unnoticeable because they were embedded in all other ordinary charges that normally escape close scrutiny by the ordinary consumer.

14

B. <u>The Defendants</u>

1.  The Trilegiant Defendants.

26.     Defendant, Affinion, is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in Norwalk, Connecticut.  Affinion markets club memberships under the auspices of its subsidiary, Trilegiant.

27.     Defendant, Trilegiant, is a corporation established under the laws of the State of Delaware, with its principal place of business located in Norwalk, Connecticut, and is a subsidiary of Affinion.

28.     Defendant, Apollo, is a limited liability company established under the laws of the State of Delaware, with its principal place of business located in New York, New York.  According to Affinion's Form 10-K filed with the Securities Exchange Commission:

> *We are controlled by Apollo who will be able to make important decisions about our business and capital structure.*
>
> Approximately 69% of the common stock of [Affinion] is beneficially owned by investment funds affiliated with Apollo.  As a result, Apollo controls us and has the power to elect a majority of the members of our board of directors, appoint new management and approve any action requiring the approval of the holders of Holdings' stock, including approving acquisitions or sales of all or substantially all of our assets.  The directors elected by Apollo have the ability to control decisions affecting our capital structure, including the issuance of additional capital stock, the implementation of stock repurchase programs, the declaration of dividends and the purchase of our indebtedness or Holdings' indebtedness, in each case, subject to the terms of our senior secured credit facility and the indentures governing our notes.  Additionally, Apollo is in the business of investing in companies and may, from time to time, acquire and hold interests in businesses that compete directly or indirectly with us.  Apollo may also pursue acquisition opportunities that may be

15

complementary to our business and, as a result, those acquisition opportunities may not be available to us.

(emphasis in original).

      2. The Defendant Credit Card Companies.

29.    Defendant, Bank of America, is a Delaware corporation, headquartered in the State of North Carolina. Bank of America is a wholly-owned subsidiary of Bank of America Corporation and Bank of America is the legal entity for Bank of America Corporation's credit card business. Bank of America is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

30.    Defendant, Capital One, is a Delaware corporation, headquartered in McLean, Virginia. Capital One is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

31.    Defendant, Chase, is a corporation established under the laws of the State of New York, with its principal place of business located in New York, New York. Chase is a wholly-owned subsidiary of JP Morgan Chase & Co. ("JPM"). Chase is the legal entity for JPM's credit card business. Chase is one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

32.    Defendant, Citibank, is a Delaware corporation, headquartered in New York, New York. Citibank is a wholly-owned subsidiary of Citigroup, and is

16

one of the largest credit card companies in the United States, with millions of credit card customers throughout the United States.

33.     Defendant, Citigroup, is a Delaware corporation, headquartered in New York, New York.  Citigroup Inc. owns Citibank, N.A.

34.     Defendant, Paymentech, is a self-described "global leader in payment processing."  Paymentech is a Delaware corporation with its principal place of business in Dallas, Texas.  Paymentech became integrated with Chase Merchant Services in 2005, shortly after the Bank One merger with JP Morgan Chase, and in 2008, Paymentech became the merchant services subsidiary of JP Morgan Chase.  At all times relevant to this Complaint, Paymentech was the exclusive processor of credit card charges for Affinion and Trilegiant, and JP Morgan Chase was also a signatory to the agreement with Trilegiant. (Tri_Schnabel 088809-10.)

35.     Defendant, Wells Fargo,  is a wholly owned subsidiary of Wells Fargo & Company, one of the nation's largest bank holding companies. Wells Fargo, its principal subsidiary, is a national banking association headquartered in Sioux Falls, South Dakota.  Wells Fargo is one of the largest credit card issuers in the United States.

### 3.     The E-Merchant Defendants

36.     Defendant, 1-800-Flowers, is a corporation established under the laws of the State of Delaware, with its principal place of business located in Carle Place, New York.  1-800-Flowers is an online merchant conducting business over the internet throughout the United States.

17

37.    Defendant, Beckett, is a corporation established under the laws of the State of Delaware, with its principal place of business located in Dallas, Texas.  Beckett operates its business of buying and selling various sports memorabilia through its website, Beckett.com.

38.    Defendant, Buy.com, is a corporation established under the laws of the State of Delaware, with its principal place of business located in Aliso Viejo, California.  Buy.com operates its e-commerce business of providing technology and entertainment retail goods as a fully owned subsidiary of Rakuten USA, Inc.

39.    Defendant, Classmates, doing business as Classmates Online, Inc., is a corporation established under the laws of the State of Delaware, with its principal place of business located in Renton, Washington.

40.    Defendant, Days Inns, is a corporation established under the laws of the State of New Jersey, with its principal place of business located in Parsippany, New Jersey.  Days Inns is a wholly-owned subsidiary of Wyndham.

41.    Defendant, FTD, doing business as FTD.com, Inc., is a corporation established under the laws of the State of Delaware, with its principal place of business located in Downers Grove, Illinois.

42.    Defendant, Hotwire, is a corporation established under the laws of the State of Delaware having its principal place of business and headquarters in San Francisco, California

43.    Defendant, IAC, is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 555 West 18th

18

Street, New York, New York. IAC acquired Shoebuy.com in 2006 as its wholly-owned business subsidiary. IAC operates its business through Shoebuy.com.

44.     Defendant, Memory Lane, doing business as Classmates.com, is a corporation established under the laws of the State of Washington, with its principal place of business located in Seattle, Washington.

45.     Defendant, Orbitz, is a corporation established under the laws of the State of Delaware and its corporate headquarters are located in Chicago, Illinois.

46.     Defendant, PeopleFinder, is a corporation established under the laws of the State of California, with its principal place of business located in Sacramento, California. PeopleFinder operates its business of obtaining public records for people through its website, PeopleFinders.com.

47.     Defendant, Priceline, is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 800 Connecticut Avenue, Norwalk, Connecticut.

48.     Defendant, Shoebuy.com, is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 101 Arch Street, 16th Floor, Boston, Massachusetts, and is a wholly-owned subsidiary and an operating business of IAC.

49.     Defendant, TigerDirect, which does business as CompUSA, is a corporation established under the laws of the State of Florida with a principal place of business in Miami-Dade County, Florida.

50.     Defendant, United Online, is a corporation established under the laws of the State of Delaware, with its principal place of business located in

19

Woodland Hills, California. In 2004, United Online acquired Classmates (whose name was recently changed to Memory Lane, Inc.). In August 2008, United Online acquired FTD.

51.    Defendant, Wyndham, is a corporation established under the laws of the State of Delaware, with its principal place of business located in Parsippany, New Jersey. Wyndham wholly owns Days Inns, and controls its day-to-day hospitality business operations.

## IV.    STATEMENTS OF FACTS

### A.    Trilegiant Has A History Of Preying Upon Consumers In Conjunction With the E-Merchant Defendants

52.    Trilegiant, which started out as Comp-U-Card ("CUC") in 1973, merged with HFS Incorporated in 1997 to form Cendant Corporation ("Cendant"). Immediately after this merger, Cendant disclosed that CUC had engaged in a massive accounting fraud, embroiling Cendant in one of the largest securities fraud actions at the time. In 2005, Cendant sold Trilegiant to Apollo, which subsequently renamed Trilegiant as Affinion Group in 2006.

53.    Since the inception of its predecessor in 1973, Trilegiant was engaged in the business of marketing and selling Membership Programs that allegedly provide "members" with the opportunity to obtain discounts on various goods and services for a recurring membership fee, usually ranging between $10 and $30 a month, assessed against the consumer's credit or debit cards. Trilegiant's business is highly profitable. For instance, in the second quarter of

20

2012 alone, Trilegiant/Affinion recorded net revenue of nearly $190 million from the "sale" of its Membership Programs.

54.     Because there is no significant market, demand or use for these Membership Programs, much of Trilegiant's success is directly attributable to its ability to "cram" consumers with unauthorized charges for the Membership Programs that consumers neither requested nor authorized.

55.     All of Trilegiant's cramming tactics share a common, indispensible element for their success: a variety of strategic alliance partnerships with the E-Merchant Defendants and Defendant Credit Card Companies to obtain access to, and process charges on, the consumers' confidential billing information.

56.     The distinction between Trilegiant and Affinion is elusive.  The main points of contact for merchant partners are Affinion employees.  Affinion personnel and the Affinion logo are involved in all parts of the sales and support process to the merchant partner.

57.     Apollo is also a large part of the scheme.  After Apollo bought Trilegiant, Apollo management ostensibly tried to "clean up" the company by reaching the 2006 attorney general and class action settlements, yet it permitted the datapass fraud to continue unabated.  And Affinion/Trilegiant also marketed Apollo's management and participation to customers.  A slide deck presented to 1-800-Flowers after the acquisition of Affinion by Apollo refers to the "Apollo relationship," which Affinion claimed would "promote an entrepreneurial spirit to accelerate value creation" within Affinion by enhancing "revenue growth" and "improved productivity" and "optimize service to customers."  Those were

21

represented as things that Apollo would do for the merchant partners. In addition, the document states that Apollo's investment style is to allow management operating flexibility on a day-to-day basis, and add value at a strategic and director level." (Tri_Schnabel 106001.) In other words, management had operating flexibility to implement datapass and market it, but Apollo would approve it and provide high level strategic direction on how it would be carried out and would indeed have approval over whether datapass would continue.

58. Because of its pervasive use of cramming tactics designed to charge consumers for the Membership Programs without their knowledge or consent, Trilegiant was the subject of numerous law enforcement actions and private lawsuits. To highlight just a few:

a. Florida Attorney General Charlie Crist reached a settlement with Trilegiant in March 2005, the terms of which required Trilegiant to "provide compensation to consumers wronged by the company's tactics in marketing various club memberships," as well as $400,000.00 to the State of Florida for its attorneys' fees, costs of investigation, and continued supervision.

b. In a class action lawsuit brought by private individuals in Illinois state court, Trilegiant agreed to pay up to $25 million in refunds.

c. California Attorney General Bill Lockyer instituted a legal proceeding against Trilegiant and Chase for "mislead[ing] consumers into becoming members of various membership programs without the

consumers' knowledge or consent."  The investigation discovered that Trilegiant had agreements with Chase to gain access to Chase's customers and market the Membership Programs.  Pursuant to these agreements, Trilegiant used Chase's name in mailings, and Chase reviewed and approved marketing materials.  On December 12, 2006, 16 state attorneys general[3] joined a $14.5 million settlement against Trilegiant and Chase.

     d.    In August 2010, New York Attorney General Andrew M. Cuomo reached a $10 million settlement against Trilegiant for tricking hundreds of thousands of New York consumers into signing up for discount clubs that charged hidden fees.

59.    Under the settlement agreement reached with 16 state attorneys general in December 2006, Trilegiant was enjoined from directly marketing the Membership Programs through mail solicitations without making certain changes to its practice, including, *inter alia*:

     a.    Disclosures regarding cancellation methods in a negative option billing practice, all in a clear and conspicuous manner such as inserting the disclosure language in the first paragraph of the main body in bold type compared to other text on the page;

     b.    Ensuring that no false or misleading representation is made to consumers that the solicitation is a refund, rebate, reward or other benefit conferred because of a business relationship between a merchant and the

---

[3] The states involved in the settlement were: Alaska, California, Connecticut, Illinois, Iowa, Maine, Michigan, Missouri, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, and Washington.

consumer or that the solicitation was a service or benefit offered by any entity other than Trilegiant;

    c.    Ensuring that membership materials clearly and conspicuously disclose, in bold face or underlined type, that the consumer has purchased a membership in a Membership Program, and that the consumer has a certain number of days to cancel the membership in order to avoid being charged for the membership;

    d.    Prior to billing a consumer for a membership charge, first obtaining the consumer's unambiguous, express, and affirmative written consent to charge a membership charge to an account, either immediately or upon the expiration of a trial offer, unless the consumer affirmatively cancels his or her membership;

    e.    Promptly credit or refund, in accordance with the cancellation policy, the amount of any unauthorized membership charge without requiring additional action by the consumer (other than requesting that the consumer provide information necessary to process the cancellation); and

    f.    Prohibiting Trilegiant from entering into, continuing, or renewing any contract with any merchant for the purpose of marketing Membership Programs that do not comply with all the injunctive provisions of the settlement agreement.

60.    Similarly, the settlement agreement reached between Trilegiant and then-New York Attorney General Andrew M. Cuomo required Trilegiant to:

a.     Fully refund fees charged to consumers who unknowingly enrolled in or authorized billing for Trilegiant discount clubs and programs;

b.     Permanently end its practice of marketing discount clubs and programs by mailing checks to New York residents;

c.     Permanently end its practice of obtaining consumers' billing information from online partner retailers;

d.     Reform its online marketing practices to ensure consumers understand they are enrolling in a program offered by Trilegiant for which they will be billed; and

e.     Make redemption forms for rebates immediately available to consumers online.

**B.     Trilegiant, In Conjunction With Various Credit Card Companies And E-Merchants, Morphed Its Business Practices Into Yet Another Fraudulent Marketing Scheme To Sell Its Membership Programs To Consumers**

61.     Despite being on notice that its marketing scheme is fraudulent, unfair, deceptive, and unlawful by virtue of its 2006 settlement with 16 state attorneys general, Trilegiant attempts to get around the settlement's injunctions by using online transactions, as opposed to the interstate mail system, to continue engaging in a virtually identical fraudulent marketing scheme to sell its Membership Programs without the consumers' knowledge, and charge recurring membership fees without the consumers' consent.  "<u>The goal of these</u> <u>[Membership Programs] was not to provide services, but to charge consumers'</u>

credit cards for as many months as possible before consumers discovered their memberships and cancelled them."[4]

62.    The mechanics of these *quid pro quo* partnership agreements are the same in every such agreement.  In exchange for a substantial portion of the revenue generated by selling the Membership Programs, the E-Merchant Defendants and Defendant Credit Card Companies allow Trilegiant to market and sell the Membership Programs to their customers, and provide access to their customers' private billing information, including their credit or debit card account numbers.

63.    Once the partnership agreement is in place, Trilegiant's fraudulent marketing scheme to sell its Membership Programs goes through several uniform steps to achieve its common goal of "charg[ing] consumers' credit cards for as many months as possible before consumers discover[] their memberships and cancel[] them."

64.    First, employing a deceptive tactic known as "post transaction" marketing, Trilegiant and the E-Merchant Defendants have uniformly created a false and deceptive appearance that these offers for discount Membership Programs are part of the consumers' original transactions with the e-merchants. Such post-transaction marketing uses, *inter alia*: (1) "interstitial" sales offer pages from Trilegiant, which appear between the checkout page and the confirmation page while the customers are completing their transactions on the

_____

[4] Supplemental Report (available at http:// commerce.senate.gov) (emphasis added).

e-merchant's website; (2) "pop up" windows with the offers which appear on top of the e-merchant's confirmation page; and (3) a hyperlink to an enrollment offer (or "banners") that are included on the E-Merchant Defendants' confirmation page.

65.     Second, once the consumers are duped into believing that the Membership Program offers are from the E-Merchant Defendants, Trilegiant uniformly allows the enrollment to go forward without ever requiring the consumer to enter his or her credit card information.

66.     With at least one method, Trilegiant enrolls consumers into Membership Programs, but never obtains a consumer's credit card information directly from the consumer. Instead, under the terms of the partnership agreement between the E-Merchant Defendants and Trilegiant, the E-Merchant Defendants provide Trilegiant with full, unfettered access to the consumers' credit card information, even though the consumers never intended to provide such information to Trilegiant. This fraudulent tactic is known as "datapass." Remarkably, Trilegiant distinguishes datapass enrollment from other types of enrollment by referring to other types of enrollment as "full enrollment," revealing that, even to Trilegiant, datapass is not "full" enrollment by the customer. Nonetheless, customers enrolled through datapass are charged and treated the same way as "full" enrollment customer. (Tri_Schnabel 089147.)

67.     The distinction between "full enrollment" and datapass was not a mere slip of the tongue. A contract amendment faxed to Priceline on October 2, 2007 expressly notes the distinction between "full enrollment" and datapass.

27

Paragraph 6 of that amendment states that "Retail Car Rental Path Solicitations" refers to the "opportunity to enroll in the service via either (i) 'partial datapass' (i.e. transfer of customer data other than customer's credit or debit card information) or (ii) 'full enrollment' (i.e. by entering their credit card and other information and transferring such information to Trilegiant." (Tri_Schnabel 087631.)

68.     An email exchange between Hotwire and Affinion discusses the different "creatives" for datapass and full enrollment. (Tri_Schnabel 090369.) ("Please see the attached screenshots – with your updates. Please note the changes were only made on the datapass creative, but I also attach the full enrollment creative an FYI."). Another communication with Hotwire notes that Trilegiant does not "report on full enrollment impressions. Because we don't monitor overall conversion for full enrollment (everything falls under the Datapass impression volume), we do not include those numbers as it will skew the conversion rates in the report." (Tri_Schnabel 090306.) A PowerPoint deck used in a presentation to Drugstore.com shows confirmation page marketing for a "full enrollment page" and then goes on to extoll the virtues of the "datapass program." In comparison to the "full enrollment," the slide deck states that datapass programs "offer an immediate revenue stream to our partners." (Tri_Schnabel 108447—68 at pp. 6-8.)

69.     The clear import of the distinction between datapass enrollment and "full enrollment" is that a customer who is ensnared by the datapass is not "fully enrolled." Indeed, Trilegiant pays its partners for displaying the offer to the

28

customer using a metric called CPM (cost per thousand impressions) which pays the customer a fee for each thousand impressions. In the Drugstore.com deck, Affinion offered $500 per CPM for full datapass, but only $300 per CPM for a partial datapass. They did not offer a CPM fee for full enrollment, but instead offered a "bounty" for each customer that actually filled out the full enrollment form.

70.    Because the consumer never has to enter any credit card information during a transaction with Trilegiant, they reasonably believe that they did not make any additional purchases apart from their original transaction with an E-Merchant Defendant. As Benjamin Edelman of the Harvard Business School, recently opined to the Senate Commerce Committee, "[consumers] rightly expect . . . they cannot incur financial obligations except by typing their credit card numbers."

71.    Third, exploiting the fact that the consumers are completely unaware of their inadvertent enrollment in these Membership Programs, Trilegiant uniformly employs a deceptive billing process known as "negative option" billing where the consumers' credit card will be automatically charged a monthly fee unless the consumers take affirmative steps to cancel the membership. The only indication on the offer page that Trilegiant engages in such negative option billing process is in exceedingly fine print. The effectiveness of such fine print in providing notice to consumers is extremely suspect. Many consumers are similar, at least in respect to their reaction to fine print, according to the Chief Justice of the United States Supreme Court, Justice John G. Roberts, Jr., who

29

openly admitted that he does not read the fine print that computer users must agree to before accessing some websites, stating that it has "the smallest type you can imagine."

72.     Affirmative consumer action to avoid unauthorized charges is impossible until consumers actually become aware that they have been inadvertently enrolled in the Membership Program. Such awareness does not occur until months, if not years, after Trilegiant first begins to charge recurring membership fees. Furthermore, the common, distinctive feature of Trilegiant's Membership Program that merely provides "access" to benefits, as opposed to periodic receipt of tangible goods, creates special hazards for consumers enrolled on a negative option basis, especially when the consumers are not even aware of purchasing "access" in the first instance.

73.     Fourth, Trilegiant uniformly employs a tactic sometimes known as "refund mitigation" to minimize the amount of improper charges they would have to refund to the millions of confused and angry consumers who eventually discover that they have been unknowingly enrolled in the Membership Programs and charged unauthorized monthly fees.

74.     On information and belief, in addition to maintaining its own call centers, Trilegiant hires other companies for the specific purpose of minimizing the number of membership cancellations by using a specific protocol to handle the thousands of consumer calls it receives each day. These call center employees are incentivized to turn away angry Trilegiant customers by the promise of receiving a bonus payment for every customer that they "save," and

by the threat of termination if their "save" rate falls below a certain threshold percentage.

75.    On information and belief, there is a high employee turnover rate at these internal and outsourced Trilegiant call centers. To constantly replenish the workforce necessary to handle the thousands of calls from angry consumers each day, Trilegiant indiscriminately hires without running any background checks on potential employees, resulting in, *inter alia*, convicted felons handling such sensitive personal and financial information as Social Security and credit card numbers.

76.    Rather than explaining to customers the real method by which they were duped into "joining" these Membership Programs, these call center employees are specifically instructed to tell the customers that they somehow signed up for the Membership Programs through their credit card company. If a customer tries to cancel a membership with Trilegiant, the employee is instructed to keep the customer by going through several "rebuttal" steps. For most datapass customers, they must do at least two rebuttals, selling the customer on the service provided by maintaining the membership with Trilegiant. If a customer uses key words such as "fraud," "attorney," "attorney general," or "lawsuit," these call center employees are instructed to transfer the call to a manager. Even though these employees are not allowed to issue more than a two month refund under any circumstances, a manager will often issue a full refund to those customers who persist in their request for a refund by using certain key words. However, for most who telephone the call center, two months is all they

31

can get refunded; if they want more, they are instructed to go through a process of putting in writing a request for an additional refund. The entire system is designed to discourage the customer from seeking a refund.

77.     As a result of this uniform, fraudulent marketing scheme, Trilegiant wrongfully and deceptively charges consumers for the Membership Programs, even though the consumers do not knowingly consent to purchasing or being billed for Trilegiant's Membership Programs, and do not provide Trilegiant with valid authorization, in writing or otherwise, to withdraw funds from or assess charges against the consumers' credit, debit, or other account.

C.      **Despite Their Awareness Of Trilegiant's Fraudulent Scheme, the Defendant Credit Card Companies Continue To Process Fraudulent Charges**

78.     The Defendant Credit Card Companies have the ability to protect their customers' accounts from fraudulent charges by using sophisticated anti-fraud software. They also have various merchant rules in place that are designed to identify and prevent fraudulent merchants from accepting unauthorized credit card transactions.

79.     Harvard Business School Professor Benjamin Edelman supplemented his initial statement to the Senate Commerce Committee with a subsequent work, entitled "Payment Card Network Rules Prohibit Aggressive Post-Transaction Tactics," in which he notes:

> American Express's Merchant Reference Guide prohibits the automatic transfer of customers' card numbers. American Express rules provide that "Merchants . . . *must not disclose Cardmember Information . . . other than to facilitate Transactions* in accordance with the Agreement" (p.7) (emphasis added). No provision of the

32

> agreement authorizes a merchant to transfer a customer's card number to another merchant. Furthermore, for a card-not-present charge, a merchant "*must . . .* ask *the Cardmember* to provide: . . . Card Number" (p.12) (emphasis added). No provision authorizes a merchant to obtain a customer's card number in any way other than by asking the customer to provide such number. Thus, post-transaction marketers violate American Express policies when they obtain customer card numbers by making copies from other merchants.

*Id.* (emphasis in original.)

    80.    Likewise,

> Visa's Rules for Merchants prohibit the automatic transfer of customers' card numbers. Visa rules provide that a charge may occur after "*the cardholder provides the merchant with the account number*" (p.7) (emphasis added). No rule authorizes charges without the cardholder providing an account number. Furthermore, Visa requires that merchants "*keep cardholder account numbers and personal information confidential*" and provide that such information "*should be released only to your merchant bank or processor*, or as specifically required by law" (p.12) (emphasis added). Transferring a card number to a post-transaction marketer does not fit any of these narrow exceptions and is therefore prohibited.

    . . .

> Visa's Rules for Merchants require merchants to request payment card expiration dates. Visa states: "Whenever possible, card-not-present merchants *should ask customers* for their card expiration . . . date" (p.40) (emphasis added). It is certainly "possible" for post-transaction marketers to *ask customers* for their card expiration dates, but post-transaction marketers do not do so. Through this failure, post-transaction marketers fall further short of applicable Visa requirements.

    . . .

> Visa's Rules for Merchants require notification to each customer before each periodic charge. For all recurring transactions, Visa indicates that merchants should "*notify the customer* before billing . . . at least 10 days in advance [of each billing] ... [includ[]ing the amount to be charged" (p.52) (emphasis added). While Visa describes this notification as optional ("should"), the principle is clear: Notify customers before each charge so

they have a meaningful and timely opportunity to decline. In contrast, post-transaction marketers routinely charge customers' Visa cards without such notification.

. . .

Visa's Rules for Merchants require that a merchant confirm a customer's preferred payment method. Under a rule entitled "Confirm the Choice," Visa explains a merchant's obligation: "To avoid any kind of misunderstanding about the customer's choice of payment, merchants should include a *confirmation page* or voice confirmation that *specifies the payment option selected* (e.g., Visa, Mastercard, Star, etc.)" (p.15) (emphasis added). While Visa describes this confirmation as optional ("should"), the principle is clear: Confirmation pages provide an important mechanism for confirming a customer's intent to enter a paid relationship. By skipping such confirmation, post-transaction marketers violate Visa's guidelines.

*Id.* (emphasis in original.)

81.   Likewise,

MasterCard's Rules specifically disallow automatic transfer of customers' card numbers. MasterCard rules provide that "a Merchant *must not sell, purchase, provide, exchange* or in any manner disclose *Card account number*, Transaction, or personal information of or about a Cardholder to anyone other than its Acquirer, to the Corporation, or in response to a valid government demand." Transferring a card number to a post-transaction marketer does not fit any of these narrow exceptions and is therefore prohibited.

. . .

MasterCard's Rules require each merchant to clearly notify consumers of the name and identity of the company that will charge their cards. MasterCard requires that merchants "*prominently and unequivocally* inform[] the Cardholder of the *identity* of the Merchant . . . so that the Cardholder can *readily distinguish* the Merchant from any other party." In particular, MasterCard requires that the Merchant's site must "prominently display the name of the Merchant . . . *as prominently as any other information* depicted on the Web site." In contrast, post-transaction marketers widely fail to present their names with the requisite prominence.

*Id.* (emphasis in original.)

82.     Trilegiant's entire business model is based on violating these credit card merchant rules.  Trilegiant and the E-Merchant Defendants repeatedly violated these rules and generated high volumes of customer complaints, triggering fraud warnings and/or fraud monitoring procedures within the Defendant Credit Card Companies.

83.     Despite abundant evidence that Trilegiant's business practices did not meet the Defendant Credit Card Companies' merchant rules, and despite their knowledge that Trilegiant's membership "club" charges are among the highest sources of complaints brought to the attention of their fraud monitoring groups, the Defendant Credit Card Companies continued to process millions of questionable credit and debit charges every month without first verifying the charges with the account holder, as they do with other questionable credit card charges.

84.     Indeed, the Supplemental Report states:

Evidence the Committee received from . . . American Express shows that the datapass process and other practices employed by [Trilegiant] and their e-commerce partners violated the credit card companies' operating rules and generated high volumes of customer complaints.     [Trilegiant] has triggered fraud warning or fraud monitoring procedures within . . . American Express. Yet, in spite of significant evidence that [Trilegiant's] business practices did not meet the credit card systems' standards, [Trilegiant] maintained access to the credit card systems and processed millions of questionable credit and debit charges through these systems every month.

***

[B]ecause the credit card companies did not vigorously enforce their own rules, [Trilegiant] w[as] able to charge millions of consumers monthly fees that the consumers had not authorized.

35

85.    There is no doubt that the Defendant Credit Card Companies have the ability to prevent this fraudulent scheme if they choose to do so, because of all the resources they have invested in fraud detection, monitoring and prevention. "With 6.89 billion in fraud losses in 2009, credit card companies eager to stem the tide are continually beefing up their anti-fraud measures, relying on sophisticated computer software to flag suspicious transactions."[5] This article goes on to quote Robert Siciliano, a McAfee consultant and identify theft expert, who states that "[t]he credit card companies … all have their own proprietary technologies that look for anomalies in your spending habits … each transaction is automatically analyzed for up to 200 different data points, everything from where you live to what you normally buy to how much you're spending, to determine the likelihood that you're the one actually making a particular charge." As an example, Mr. Siciliano noted that at one time he tried to "make an addition to an online purchase … but the second transaction [the e-merchant] tried to process was declined [because the] card issuer 'thought that the merchant was *taking advantage* of my card number.'" *Id.* (emphasis added).

86.    Just as Mr. Siciliano's online transaction was declined, the Defendant Credit Card Companies should have flagged the Trilegiant transactions as suspicious because the E-Merchant Defendants and Trilegiant were taking advantage of the Plaintiff's card number. Given the duration and volume of the fraudulent scheme, the Defendant Credit Card Companies knew

---

[5] *7 reasons your credit card gets blocked*, http://www.foxbusiness.com/personal-finance/2010/08/06/reasons-credit-card-gets-blocked/ (last visited  12/5/12).

that their customers were unknowingly being enrolled in these worthless programs and should have instituted their fraud measures, including declining a transaction or contacting the customer for verification. The Defendant Credit Card Companies chose not to do so because they profited from their participation in the fraudulent scheme – a scheme that could not have operated without the Defendant Credit Card Companies continually processing the monthly transactions.

87. As a further example of the tools at the Defendant Credit Card Companies' disposal to prevent this fraudulent scheme, two of the major credit card brands, MasterCard and Visa, have sophisticated fraud detection and monitoring technologies. In a white paper discussing credit card fraud, MasterCard noted that "[c]ard fraud costs the U.S. card payments industry an estimated USD 8.6 billion per year."[6] MasterCard noted that "[o]ver the last few years, the payment industry has adopted technologies that significantly reduce fraud rates" and that banks "can create better authorization strategies at the point of sale." *Id.* In fact, MasterCard stated that the "*role of authorization is vital in preventing fraud.*" *Id.* (emphasis added). MasterCard then touts its abilities to prevent fraud by claiming that its "experts can build fraud models which are tailored to identify the latest fraud patterns across geographical markets, transaction types, card products, and cardholder segments." *Id.* Similarly, "Visa's e-commerce fraud detection system is the first of its kind to use *current*

---

[6] *How the Past Changes the Future of Fraud,* http://www.mastercard.com/us/company/en/docs/Modeling_white_paper.pdf (last visited 12/5/12).

37

*worldwide fraud trends* and global payment-card usage patterns to provide a comprehensive assessment of transaction risk.[7]

88.    Just like MasterCard and Visa, each of the Credit Card Defendants has its own fraud department and each employs its own fraud detection and monitoring systems; thus, each has the ability and, in fact, has exercised its ability, to flag or decline a suspicious charge and to contact its customers for verification before a suspicious charge is processed. Given the prevalence of the fraudulent scheme and the knowledge of the numerous complaints from customers about the fact that they never authorized or agreed to enter into any monthly subscription service with Trilegiant, the Defendant Credit Card Companies should have flagged such charges as suspicious and contacted the card holder for verification.

89.    For example, in addition to utilizing Visa's e-commerce fraud detection system, Bank of America offers what it calls "Total Security Protection" and touts that it "monitors how and where your card is being used. More importantly, [it] blocks potential fraud if unusual patterns are detected."[8] Consistent with this representation, a Bank of America debit card customer posted a story about how he was contacted about some suspicious activity in his account after two large purchases and numerous smaller purchases were made.[9]

---

[7] http://merch.bankofamerica.com/documents/10162/12961/Fraud+Monitoring.pdf (last visited 12/5/12) (emphasis added).
[8] https://www.bankofamerica.com/privacy/Control.do?body=privacysecur_prevent_fraud (last visited 12/5/12).
[9] http://www.moneycrashers.com/how-to-respond-to-unauthorized-transactions-in-your-bank-account/ (last visited 12/5/12).

90.    A Chase credit card customer posted that he was contacted about potential fraud involving iTunes.[10] In response to this post, another poster commented that his bank told him that "*this was a pattern*. One small charge at iTunes to test the card information and then a larger totally out of character purchase often from someplace geographically ridiculous to where the card holder lived, to a place they'd never spent money." *Id.* (emphasis added). There is no reason that Chase, or any other of the Defendant Credit Card Companies, could not have configured its fraud detection system to detect a similar pattern with the fraudulent scheme - a purchase at one of the E-Merchant Defendants immediately followed by a charge to a monthly subscription service operated by Trilegiant. In fact, "Chase has a fraud department which monitors accounts to protect against fraud. Some determining factors such as *type of merchant*, location of the merchant, amount of charge, any unusual activity can all trigger a suspicion. The Chase fraud department in such cases normally tries to contact the customer first to verify the transactions."[11]

91.    Likewise, on one forum, the poster actually posed the question "Does Capital One's Fraud Department call you too often?"[12] Another Capital One credit card customer recounted a story about how a purchase from a Japanese website triggered a fraud alert, even though the customer had

---

[10] http://ask.metafilter.com/155037/What-tipped-off-the-credit-card-company-for-fraud (last visited 12/5/12).

[11] http://fraudfinder.net/what-does-the-chase-fraud-department-do/ (last visited 12/5/12) (emphasis added).

[12] http://www.early-retirement.org/forums/f27/does-capital-ones-fraud-department-call-you-too-often-38098.html (last visited 12/5/12).

previously purchased from the same vendor without any problem.  To get the valid charge approved, the customer had to "verify some info and if I recognized the merchant that made the charge."[13]  That Capital One contacted these customers is not surprising, because Capital One expressly states on its website that "[o]ur Fraud department may contact you if we detect potentially suspect activity on your account."[14]

92.     Similarly, a Citibank credit card customer posted in 2006 about a suspension of his account for "suspicious" activity.  The activity that was flagged was recurring "charges that have been *processed on my account month after month* as part of a service I subscribe to."[15]  While that customer actually knowingly entered into the subscription service, it is curious that Citibank does not flag the recurring charges from Trilegiant, despite the numerous complaints it receives pertaining to Trilegiant's practices.  Citibank itself states that it has "Fraud Early Warning" such that "[i]f there's any unusual activity on your credit or debit card such as out-of-state charges or an expensive purchase, we'll contact you to verify the charges."[16]  In a Citibank presentation to the GSA Federal Supply Service, a slide discussing "Fraud Early Warning" contains three bullet points that state "Account closure," "Verify transactions with cardholders"

---

[13] http://ficoforums.myfico.com/t5/Credit-Cards/lol-Capital-One-Fraud-Protection/td-p/1262329 (last visited 12/5/12).

[14] Fraud & Identity Theft Prevention, http://www.capitalone.com/identity-protection/security/communication/ (last visited 12/5/12).

[15] http://joelcomm.com/citibank-credit-card-troubles.html (last visited 12/5/12) (emphasis added).

[16] https://online.citibank.com/US/JRS/pands/detail.do?ID=DebitCreditCardSecurity (last visited 12/5/12).

and "Identify and escalate trends for investigation." The very next slide discussing "Risk modeling" states, *inter alia*, "Identify fraud usage patterns, MCC trends, *suspicious merchants*."[17]

93.     Thus, the Defendant Credit Card Companies all have the dynamic technology to detect and prevent the fraudulent scheme and have either declined charges or contacted their customers for verification of suspicious charges. The only plausible explanation why the Defendant Credit Card Companies chose not to stop the fraudulent scheme here is because they are knowing participants in the scheme and profit greatly from it.

94.     The Defendant Credit Card Companies profit from Trilegiant transactions, earning a percentage of the fee Trilegiant charges for each of the hundreds of thousands of "memberships."

95.     In addition, Paymentech was a crucial link between Trilegiant and the other Defendant Credit Card Companies, as Paymentech processed all of the charges Trilegiant claimed were authorized by Plaintiff and members of the Class.

96.     Paymentech knew that Trilegiant was generating large numbers of "chargebacks" for reasons such as "authorization not obtained," "fraudulent transaction – no cardholder authorization," "cardholder does not recognize the transaction – potential fraud" and "fraudulent transaction – card not present." These are standard chargeback codes used by the Visa and Mastercard networks.

---

[17] *Preventing Fraud and Misuse in Your Card Program*,
http://www.citibank.com/transactionservices/home/sa/a2/gsasmartpay2/reference/
docs/gsa06/misuse.pdf (last visited 12/5/12) (emphasis added).

97.     A chargeback is what occurs when a credit card company returns a transaction disputed by the cardholder. Thus, when Trilegiant itself provides a credit, that is not a chargeback in the parlance of credit card processing. Nor is it a chargeback when the credit card company directs the cardholder to call Trilegiant directly, and Trilegiant provides a credit instead of having the credit reversed by the credit card company. Given these important definitional predicates, the number of chargebacks is simply staggering when the credit card company-initiated chargebacks are added to the Trilegiant generated refunds.

98.     The Defendant Credit Card Companies regularly told irate cardholders to call Trilegiant to get an explanation of the TLG or GRT*FUN charges, thereby cutting themselves out of the process and causing the cardholders to fend with Trilegiant themselves. Thus, the number of credit card company-initiated chargebacks is not remotely reflective of the Defendant Credit Card Companies' knowledge and awareness of Trilegiant's fraudulent business practices.

99.     Paymentech had a particularly acute insight into Trilegiant's business practices, as Paymentech provided regular "chargeback reports" to Trilegiant and also acted as the recipient of warnings from the Visa and Mastercard networks concerning Trilegiant. In many of the months in 2007, 2008 and 2009, Paymentech received notice that Trilegiant was receiving excessive numbers of international chargebacks. In addition, Paymentech knew that Trilegiant had received a "High Risk Designation," and that the High Risk Designation "is based on the marketing method, not the product itself."

(Tri_Schnabel 088409.)  Paymentech also regularly received "violation notices" from Visa dealing with cardholder claims. (See Tri_Schnabel 088434.)  Further, according to Paymentech data provided to Affinion, first quarter refunds for the Membership Programs (just a slice of Trilegiant business, but the part most relevant to this lawsuit) represented 7.8% of transactions and nearly 15% of dollar volume.  (Tri_Schnabel 088377.)

100.    An undated, but likely late 2008, Affinion document notes that Affinion was given notification "by its merchant acquirer, Chase Paymentech, for reaching Workout Period 2 of the VISA RIS (Risk Identification Service) Program" and that, as a result, Affinion had to propose a plan of action "in order to reduce the number of reported 'potential fraud' transactions each month." The "plan" was to review "the Terms and Conditions on Affinion Group solicitation materials . . . to ensure that customers enrolling are aware of the product they are signing up for," but this review never took place, as the datapass continued unabated, and Paymentech did nothing to ensure that this plan of "action" was implemented.  (Tri_Schnabel 088416.)

D.      In Addition To Processing Fraudulent Charges, The Defendant Credit Card Companies Actively Promoted The Scheme

101.    Examples of the Defendant Credit Card Companies' active promotion of the scheme are found in customer statements as follows:

a)      "**ATTENTION CARDHOLDERS:  GET MONEY BACK ON PURCHASES MADE ON YOUR CREDIT CARD.  With Trilegiant's Secureall offer, you can enjoy savings and

security for you—and for your family too—with the first 60 days for only one dollar.  Call 1-866-883-SAFE…"

b) "Save on appliances, MP3 players, toys and more at Shoppers Advantage.  Earn cash-back rewards on eligible purchases in addition to the low prices.  Get details at www.ShoppersAdvantage.com/Chase, where you'll be identified as a Chase Cardmember eligible for this special Trilegiant offer."

c) "Protect your credit card with ID Secure monitoring.  Try it now at www.idsecure.com/chasesite, and you'll be identified as a Chase Cardmember entitled to this Trilegiant offer, which includes up to $20 cash back for dining!"

d) "Save on dining, activities, hotels & more with Great Fun.  Learn more at www.greatfunsite.com/Chase and you'll be identified as a Chase cardmember entitled to this great Trilegiant offer—which includes $20.00 cash back."

e) "Save on nearly everything for your home: repairs, renovation, shopping & more.  Learn more at www.completehome.com/Chase, and you'll be identified as a Chase cardmember entitled to this great Trilegiant offer, which includes $20.00 Lowe's gift card!"

44

102.   As these statements demonstrate, Chase actively promoted the

Membership Programs while, for the reasons stated above, it was well aware of

the fraudulent nature of the scheme.

   E.   Trilegiant And The E-Merchant Defendants Are Fully Aware of The
        Consumer Complaints Caused By Their Fraudulent Scheme, Which
        Generated Billions Of Dollars In Revenue

103.   Trilegiant received thousands of complaints from consumers

claiming that they were unknowingly enrolled in the Membership Programs while

they were shopping online, and that they never authorized Trilegiant to assess

charges on their credit cards.  A small sampling of the consumer complaints

include:

   a)   "I do not appreciate the trap on your 1 800 Flowers.  Get 15.00
        of [sic] your purchase.  LiveWell.net.  Push a button and your
        [sic] are enrolled and automatically charged a mo. Fee.  Gee
        thanks for the trouble this has caused me.  I will never order
        from 1 800 Flowers again."

   b)   "I registered for the Livewell program without realizing that I
        was going to be charged $12/month for a service that I don't
        want.  I called them to cancel and they told me I couldn't
        cancel it seeing as though I hadn't registered for 48 hours.  I
        should not have to on multiple occasions call to refuse a
        service I don't want and I think it's a detriment to 1-800-
        Flowers and their business practices being that 1-800-Flowers
        is a reputable source for inexpensive gifts that they be
        associated with a scam like this.  If I am charged a single cent
        for any services that I thought was a complimentary service
        only to find out that it has to be called and cancelled especially
        when I attempted to do just that and was refused I will NEVER
        shop with 1-800-Flowers again."

   c)   "Just like the previous order I was offered a chance to save
        additional money by signing up for LiveWell.  I never received
        any rebate from LiveWell and had a difficult time cancelling
        LiveWell.  I have reported LiveWell to my state's attorney

45

general and am considering reporting 1-800-flowers.com also
due to their association with LiveWell."

d)   "I did not like the intrapment [sic] technic [sic] below.  Your
purchase is complete.  Click here to claim $15.00 Cash Back
on this purchase! . . . Thank you for shopping at 1-800-
Flowers.com we look forward to your return visits!  This led
me to sign up for something I did not want and now I have to
go through the process of cancelling.  If I get push back on
cancelling the www.LiveWell.net services I will never do
business with 1-800-Flowers.com again."

e)   "I am furious!!!!! with 1-800-Flowers.com.  They basically
tricked me with the $20.00 cash back advertising that signed
me up with the LIVEWELL company who has access to my
personal information including my credit card.  When I called
them they gave me the LIVEWELL company 1-800 number
which was closed.  This seems to be almost a FRAUD they are
doing and 1-800-FLOWERS HAD LOST ME AS A CLIENT."

f)   "Since July we have been charged 38.99 several times without
authorization. The charges were made by TLG*LIVEWELL, who
is obviously in shifty dealings with 1-800-Flowers.  WHAT A
SCAM.  Call your Attorney General and lets demand a class
action lawsuit against this company!!! Also, who knows what
type of overdraft fees we all have incurred because of this!! 1-
800-Flowers should be out of business!!! My husband and I are
pissed and hope to bring justice to all that were scammed by
these criminals!!!"

g)   "I checked my bank statements from HSBC and noticed
unauthorized charges from TLG now known as Trilegiant upon
further investigation. Since 2009 I have been charge from 8.99
- 169.99 for services I did not request. More than $1000 dollars.
This is a scam and I would like to have my money refunded to
me in full. This company has got to be stopped. Many people
are suffering financial hardship because of these thieves."

h)   "After I made an online parking reservation I was presented
with a pop-up ad soliciting a trial $1 membership to separate
products Great Fun (80798135) and Travelers Advantage
(2215-80798285), part of Trilegiant (TLG). They stated that if I
canceled during the 30-day trial membership I would receive a
$10 rebate to my credit card for each product.  I canceled in 20

46

days, received nothing Each product replied to my email disavowing any knowledge of a $10 rebate."

i)    "I found the charge for 69.99 on my recent Chase MasterCard statement from TLG*EVRYDAYVAL, which I did not recognize. I did a quick web search, found the consumeraffairs site and the many complaints related to Trilegiant marketing. I too did not recall signing up for every day values and certainly did not receive any services for the $349.95 that had been charged to my card over the past 2 years. Once I had Trilegiant on the phone, I went through two levels of 'supervisors' and onto the Megan at the 'president's' office.  It seemed to help that I mentioned the numerous class action lawsuits pending and/or settled regarding the various Trilegiant schemes."

j)    "I have been an on-line Bank of America customer for years.  I do not receive any written material by mail.  The company named Buyers Advantage stated to me that I had "authorized" the form mailed to me by Bank of America.  Lie.  After over one hour of telephone switching, I still cannot get the bank to reverse this un-solicited charge.

Buyers Advantage is a third party partner with Bank of America and they can and have accessed confidential information, supposedly protected by Bank of America.

No one at Buyers Advantage or Bank of America will indicate when this charge will be reversed."

k)    "From what I'm seeing all over the 'Net, it looks like I'm not the first (or only) person to get scammed by these folks.  Last night I noticed that I've been charged $12.99 a month for the past three months from 'TLGGRTFUN'.  After doing some searching (and it didn't take much) I finally learned who these folks were.  I never heard of Trilegiant before, nor 'Great Fun'. I certainly didn't ask to become a 'member', at least not intentionally.  I don't even know what they actually sell.  I certainly didn't receive anything for my $38.97.  Found a customer service number from another complaint site (not posted on Great Fun's site, BTW.) and cancelled today. Planning to ask credit card company to charge back the three charges.  I don't know or care if these guys are even a real business.  From my experience and that I'm seeing reported by many, many others, their practices are at least deceptive, if

not illegal outright.  I STILL don't even know how they got my credit card number or were able to charge me monthly without my permission.  I'm sure they are making millions each month from other folks who haven't noticed the charges on their own accounts yet.  Loss of $38.97 (and it would have been more if I didn't notice the suspicious charges on my credit card statement.)"

l)    "This company deducted $11.99 from my account after I purchased a ticket through Orbitz.  They said I signed up for it and later canceled it.   I never signed up or received any coupon nor did I cancel it before today, 1/30/08.  They refused to refund the full amount and said I would have to write for a refund and wait 4-6 weeks.  They owe me $71.94.  Supposedly they will refund $47.96 in the next 30 days but not the remaining amount until their Executive Board reviews my faxed or mailed request."

m)    "I bought a plane ticket on line and was signed up without my knowledge or permission to have Great Fun charge my Amex card $11.99 every month since 04/08.  Amex is disputing Nov., Dec., & Jan. charges, but won't go back any farther than that. Called Great Fun who promised to cancel the account but refused to refund any of the money they took."

n)    "I just checked an Amazon credit card i rarely use to find that I have been charged a $12.99 membership fee for several months.  Apparently, this company Great Fun is affliated in some way with Classmates.com.  I had a three month membership with Classmates, which I cancelled, and have no recollection of signing up with Great Fun.  I am contacting my State Attorney General's office and will be disputing this charge with my credit card company and Great Fun.  I have researched this company and have discovered that they have several lawsuits against them for fraudulent charges . . . I hope to add Idaho to the long list of states going after these people for consumer restitution."

o)    "I noticed a $13.99 charge on my Wells Fargo statement that I did not recognize.  I followed it up and found out that Trilegiant had been charging me monthly for eight months for a service which I did not know I had called Traveler's Advantage.  On my statement it is labeled as "ID Theft Protection."  The first lady I talked to told me that I was a canceled member after I had signed up for a trial month membership to receive a free

48

portable DVD player.  My trial period was supposed to start
when I received my membership pack and DVD player.  I never
received either. Once they get your account, they charge you
as secretly as possible.  I never noticed the charge nor did I
ever receive anything from them in the mail or online to
indicate I had a membership with them."

p) "I have had two unauthorized charges to my Wells Fargo
checking account in the amount of $12.99 each.  I complained
to the company in May, 2009.  I have yet to receive a refund.  I
have disputed the charges with Wells Fargo. Wells Fargo has
endorsed this company as being legitimate.  I did receive a
mailing from Wells Fargo asking me to authorize the $12.99
per month membership fee which I never signed.  Seems like
Trilegiant Corporation has not changed its business practices
by making unauthorized charges to banking consumers.  I am
going to continue calling Trilegiant to demand a refund."

q) "[Trilegiant] is a company with whom I had never dealt and
never bought anything from.  Yet, they charged my Capital
One credit card with $12.99 for 6 months before I noticed the
charges."

104.  Despite the flood of consumer complaints, Trilegiant continues to

engage in the same fraudulent marketing scheme under its partnership

agreements with numerous e-merchants, including the E-Merchant Defendants.

105.  Together with two other online marketers investigated by Congress,

Trilegiant generated over $1.4 billion in revenue from Internet consumers who

were charged for Membership Programs, $792 million of which went to e-

merchant partners, including the E-Merchant Defendants.

106.  Each of the E-Merchant Defendants participated in the scheme by

directing and controlling it.  Plaintiff has not yet taken discovery; however,

Plaintiff has received a small number of documents, some of which he has

reviewed and included in this Complaint.  From the limited discovery received,

the story is damning for many of the E-Merchant Defendants, and discovery will further illuminate the fraud as to all others. However, the following common facts are true for all of the E-Merchant Defendants, and these facts by themselves establish direction and control of the enterprise:

a.      Each E-Merchant Defendant contracted with Trilegiant using a standard partnership agreement which provided for the deceptive marketing practices described herein. Each E-Merchant Defendant formed an association-in-fact with Trilegiant for the shared goal of maximizing profits through the use of deceptive marketing tactics and used this association-in-fact to defraud Plaintiff and other members of the Class. This association-in-fact constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

b.      Each E-Merchant Defendant contracted and worked in conjunction with Trilegiant to insure that the online marketing transactions for all post-transaction solicitations had the "look and feel" of the E-Merchant Defendant's website in order to deceive Plaintiff and other Class members into believing they were continuing to interact with the E-Merchant Defendant rather than with a third-party, Trilegiant.

c.      Each E-Merchant Defendant is able to direct and control the enterprise through the way it opens its website to datapass. As the "Datapass-Token Customer Interface" document states, "[t]he [merchant] partner displays a pop up page or a banner link at the completion of the transaction." (Tri_Schnabel 122756.) In other words, the E-Merchant

Defendant is the one that is responsible for displaying fraudulent inducement to the customer. In addition, the E-Merchant Defendant is a critical and active participant in the transmission of data between the customer and Trilegiant/Affinion. That same document makes it clear that "[i]f the user clicks the banner or the submit button on the pop up, the [merchant] partner website will pass a 'token' and 'ref' to Affinion." It is only at that point, after the "token" and "ref" are passed from the merchant to Affinion, that the merchant partner leaves the active part of the scheme as after the "token" and "ref" are passed, "the customer is then presented with an Affinion hosted offer page . . . ." However, the E-Merchant Defendant returns to the process once the customer "clicks the accept button. Affinion will make an XML request to a predefined [merchant] partner website location over SSL. This request will include the original token passed from the client website. The XML response from the client will include the appropriate customer information," which includes the customer credit card information. The E-Merchant Defendant is thus actively involved in the entire process. The E-Merchant Defendant controls the content and manner of what is displayed to the customer and the E-Merchant Defendant is obligated to pass on the information at the different phases of the process.

       d.     Each E-Merchant Defendant repeatedly provided Trilegiant with consumers' confidential billing information. Each time Trilegiant unlawfully obtained a consumer's confidential billing information from the

E-Merchant Defendant, the transaction constituted an association-in-fact enterprise between the E-Merchant Defendant, Trilegiant and the credit card company authorizing the transaction.

e.      Each time an E-Merchant Defendant passed data, including confidential billing information, to Trilegiant without the express consent of Plaintiff or other consumers, *i.e.* committed a datapass, both the E-Merchant Defendant and Trilegiant committed an act of wire fraud pursuant to 18 U.S.C. § 1343.

f.      On thousands of occasions, Trilegiant has, and continues to, charge Plaintiff's and consumers' credit cards using information passed to Trilegiant by an E-Merchant Defendant without consent or authorization. Each time Trilegiant charged, or continues to charge, Plaintiff's, and other consumers', credit cards for "membership programs" using information passed to Trilegiant by the E-Merchant Defendant, Trilegiant engaged in wire fraud for which the E-Merchant Defendant is also liable under 18 U.S.C. § 1343.

g.      At all relevant times, each E-Merchant Defendant was aware that Trilegiant engaged in identical illegal and deceptive tactics with other "e-merchant partners."

107.    As illustrative examples, based on the limited discovery undertaken to date, Plaintiff makes the following specific allegations regarding Defendants 1-800-Flowers and Priceline.  Upon information and belief, Plaintiff alleges that the same or similar facts and circumstances pertain to all E-Merchant Defendants.

A.   The Role of Defendant 1-800-Flowers in the Scheme

108.   Defendant, 1-800Flowers, was a participant directing and controlling the fraudulent scheme discussed herein.

109.   An Affinion document states that "1800Flowers [is] becoming integrated as a key benefit provider for Affinion."  (Tri_Schnabel 094077.)

110.   1-800 -Flowers became an Affinion "partner" in 2004, and in an agreement dated April 27, 2004, agreed to provide consumer information via the datapass.  Specifically, the agreement required 1-800-Flowers to deliver to Trilegiant "in a machine readable format mutually acceptable to both parties" which contain the 1-800-Flowers' customer's "first and last names, email address, date of birth, credit card number and expiration date."  Each E-Merchant Defendant had agreements with identical, or substantially similar, requirements.

111.   Interestingly, 1-800-Flowers abandoned its datapass participation shortly thereafter because of "customer privacy concerns."

112.   However, in 2007, 1-800-Flowers became concerned that it was making less money from the Trilegiant programs since it had abandoned the datapass, and asked Trilegiant for options on how to increase revenue.  A slide deck presented in a meeting between Affinion and 1-800-Flowers discusses those options.

113.   That slide deck notes that "removal of datapass technology in December 2004 dramatically reduced conversion" and that "volume has steadily declined since 2004" and "revenue has also declined."  (Tri_Schnabel 106019.)

114. The document goes on to note that 1-800-Flowers was lagging in "conversion rates among retail partners by more than 80% because of the absence of datapass. The document queries "how can we improve performance at 1800-Flowers.com?", and goes on to suggest "partial datapass transaction" which, in the vernacular of this fraud, would provide for a "smoother enrollment process." Indeed, the process was so smooth with the datapass that the consumers were not even aware they were being enrolled. That same document identified datapass as the "most significant opportunity."

115. Shortly after this presentation on April 3, 2007, Trilegiant entered into a contract amendment with 1-800-Flowers, the datapass was restored and 1-800-Flowers customers soon thereafter began to get defrauded in droves.

116. 1-800-Flowers did not simply agree to do the datapass either. It had final say over the presentation of the deceptively worded "do you want $20 cashback on this transaction" come on, and it also had final say over the interstitial window that popped up. The contract provides that the Trilegiant must present all such materials "to Flowers for its prior review and written approval in each and every instance."

117. 1-800-Flowers was so happy with the datapass results that it sought to incorporate for it into its own proprietary "membership club," which it branded as "LiveWell." 1-800-Flowers engaged Trilegiant to not only "sell" LiveWell to 1-800 Flowers customers via datapass, but Trilegiant began to "sell" LiveWell through the datapass to customers of other merchant partners as well. Thus, 1-800Flowers knew that it was making money off of LiveWell memberships that

were being crammed onto its own customers, and customers of other merchants as well.

118.   Indeed, 1-800-Flowers was well aware that its customers were getting defrauded. On February 19, 2009, Jill Vidal of 1-800-Flowers forwarded a complaint to Elaine Bradley–Ryan of Affinion and stated, "a day isn't going by that Jim and I don't get this [type of complaint]" and that "the noise has grown dramatically of late . . . . to be clear this isn't about this one, its just every day more and more."   (Tri_Schnabel 114748-50.)

119.   A March 2, 2009 email from 1-800-Flowers' Jill Vidal refers to "another site to monitor" and attaches a customer complaint email sent to 1-800Flowers' sister company, Plow and Hearth, that refers to all the complaints on the website whocallsme.com.  The complaint email asks, "are you sure you want to align yourselves with a company that is generating so much negative publicity for themselves?" (Tri_Schnabel 089140.)  The answer, in 1-800-Flowers' case, was yes, given how much money it was making off of its scheme.

120.   A November 2008 email exchange between 1-800-Flowers and Affinion is even more telling. (Tri_Schnabel 106094-96.)  In this email exchange, 1-800-Flowers' employees expressed a desire to find out why, on the website consumeraffairs.com, "we have so many [complaints], and FTD and ProFlowers have hardly any?  It is impossible that they have hardly any."  That same employee said he had read the descriptions of consumers who were unknowingly charged "and told his fellow 1-800-Flowers employee "that's a pretty sketchy thing, don't you think" and went on to surmise that the consumer must be "not

55

reading or just missing the fine print." But he went on to query "can I ask you why would we subscribe to such a program?"

121.   The issue escalated up the 1-800-Flowers chain to Ms. Vidal who states that 1-800flowers was already monitoring the consumeraffairs.com site, but she passed it on to Elaine Bradley-Ryan at Affinion. Ms. Bradley Ryan reviewed all the complaints on the site and stated that "of the total 190 complaints, 143 were received since we started datapass marketing in April 2007." Nonetheless, she urged Ms. Vidal to ignore such complaint sites because they are "subjective and the content is biased" and urged her to only deal with customers who complain directly, which, of course, is a key component of the refund mitigation strategy.

122.   Complaint calls got so numerous that 1-800-Flowers had to reach out to Trilegiant to get Trilegiant to stop its agents from giving 1-800-Flowers' phone number to irate customers and having them call 1-800-Flowers directly. A November 20, 2008 email from Ms. Vidal of 1-800-Flowers complains that "we have had increasingly more frequent feedback from our own teams that your agents are telling our customers to call us" and wanted to work with Trilegiant to "reduce the negative comments from our customers back to our internal agents." (Tri_Schnabel 089106.)

   B.   The Role of Priceline in the Scheme

123.   Priceline is another large merchant partner of Trilegiant. Priceline was paid a $1 million "signing bonus on May 22, 2007 for agreeing to open up its system for Trilegiant marketing and to participate in the datapass. The specific

terms of the signing bonus make clear that Priceline would have to return prorated amounts if it canceled the agreement before it ended. Priceline had massive financial incentive to continue its participation in the fraud.

124.   Indeed, a 15 page July 22, 2009 spreadsheet lists well over 100 complaints Priceline received from March-July 2007. (Tri_Schnabel 115207-22.) Typical of the complaints is one in which the customer states that "Priceline did not have my permission to disclose my card details." Another stated that "I had no idea they would charge me every month for this service" and that "you should not be operating with such a shady company." Indeed, a repeated theme is the complete surprise from the customer when they called Trilegiant and were told that Trilegiant got the customer credit card information from Priceline.

125.   Despite this level of knowledge, a December 18, 2008 email within Trilegiant states that "we had dinner with Priceline last night and they are "chomping at the bit to get something" – meaning, they wanted to get a renewal done. And, the issue in renewal was not abandoning datapass. To the contrary, all Priceline was seeking was a better bucketing of reports so that it could see "the number of inbound calls to the call center in a given month per can/csv code." In other words, Priceline wanted the results of the fraud to be more transparent to it, instead of making the sales process more transparent to the customer. (Tri-Schnabel 092353-54.) This way, it could better monitor how much fraud it could get away with before it started impacting its core travel business.

## CLASS ACTION ALLEGATIONS

126.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on behalf of himself and all others similarly situated.  The

Classes (collectively, "Class" or "Classes") are defined as follows:

### RICO Class (Against All Defendants):

All persons or entities who reside in the United States, its territories or
Puerto Rico and who, while completing online sales transaction(s) with the
E-Merchant Defendants, were enrolled in, and subsequently charged for,
one or more of Trilegiant's Membership Programs, including, but not
limited to, AutoVantage, Buyers Advantage, CardCops, CompleteHome,
Everyday Privileges Gold, Everyday Values, HealthSaver, Great Fun!, Great
Options, Hot-Line, IdentitySecure, Just For Me, LiveWell, PC Safety/Plus,
Privacy Guard, Shoppers Advantage, and Travelers Advantage during the
Class Period.

The RICO Class Period is July 2007 to the present.

### ECPA Class (Against Trilegiant, Affinion, and the E-Merchant Defendants):

All persons or entities who reside in the United States, its territories or
Puerto Rico and who, while completing online sales transaction(s) with the
E-Merchant Defendants, were enrolled in, and subsequently charged for,
one or more of Trilegiant's Membership Programs, including, but not
limited to AutoVantage, Buyers Advantage, CardCops, CompleteHome,
Everyday Privileges Gold, Everyday Values, HealthSaver, Great Fun!, Great
Options, Hot-Line, IdentitySecure, Just For Me, LiveWell, PC Safety/Plus,
Privacy Guard, Shoppers Advantage, and Travelers Advantage and had
their confidential credit or debit card information provided to Trilegiant
over the Internet, during the Class Period.

The ECPA Class Period is July 2009 to the present.

### State Law Consumer Fraud Class (Against Trilegiant, Affinion, Apollo, and the E-Merchant Defendants):

All persons or entities who reside in the United States, its territories or
Puerto Rico and who, while completing online sales transaction(s) with the
E-Merchant Defendants, were enrolled in, and subsequently charged for,
one or more of Trilegiant's Membership Programs, including, but not
limited to, AutoVantage, Buyers Advantage, CardCops, CompleteHome,

Everyday Privileges Gold, Everyday Values, HealthSaver, Great Fun!, Great Options, Hot-Line, IdentitySecure, Just For Me, LiveWell, PC Safety/Plus, Privacy Guard, Shoppers Advantage, and Travelers Advantage, during the Class Period.

The State Law Consumer Fraud Class Period is July 2008 to the present.

<u>Unjust Enrichment Class (Against All Defendants):</u>

All persons or entities who reside in the United States, its territories or Puerto Rico and who, while completing online sales transaction(s) with the E-Merchant Defendants, were enrolled in, and subsequently charged for, one or more of Trilegiant's Membership Programs, including, but not limited to, AutoVantage, Buyers Advantage, CardCops, CompleteHome, Everyday Privileges Gold, Everyday Values, HealthSaver, Great Fun!, Great Options, Hot-Line, IdentitySecure, Just For Me, LiveWell, PC Safety/Plus, Privacy Guard, Shoppers Advantage, and Travelers Advantage, during the Class Period.

The Unjust Enrichment Class Period is July 2005 to the present.

127.    The following persons are excluded from the Classes: (1) all persons or entities that make a timely election to be excluded from the proposed Classes; (2) Defendants and their legal representatives, officers, directors, assignees and successors; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

128.    Plaintiff reserves the right to modify or amend the Class definitions before the Court determines whether certification is appropriate.

129.    Certification of Plaintiff's claims for Class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

130.   Numerosity Under Rule 23(a)(1): The members of the Classes are so numerous that individual joinder of all the members is impracticable.  Thousands of consumers have been illegally charged monthly membership fees without their authorization.  The exact number of Class members can be identified from records maintained by Defendants.

131.   Commonality Under Rule 23(a)(2): This action involves common questions of law and fact, including, but not limited to, the following:

(a)   Whether Trilegiant's monthly membership charges to Plaintiff and Class members' credit and debit card accounts without their authorization constitutes wire fraud within the meaning of 18 U.S.C. § 1343;

(b)   Whether Trilegiant's monthly membership charges to Plaintiff and Class members' credit and debit card accounts without their authorization constitutes mail fraud within the meaning of 18 U.S.C. § 1341;

(c)   Whether Trilegiant's monthly membership charges to Plaintiff and Class members' credit and debit card accounts without their authorization constitutes bank fraud within the meaning of 18 U.S.C. § 1344(2);

(d)   Whether Trilegiant's practice of enrolling consumers in the Membership Programs and charging monthly fees without proper authorization constitutes a pattern of racketeering activity;

(e)     Whether an association-in-fact enterprise exists among Trilegiant, Affinion, Apollo, the E-Merchants Defendants and the Defendant Credit Card Companies, within the meaning of 18 U.S.C. § 1961(5);

(f)     Whether Trilegiant, Affinion, Apollo, the E-Merchants Defendants and the Defendant Credit Card Companies conduct lawful business activity unrelated to the illegal wire, mail, and bank fraud that constitutes the pattern of racketeering;

(g)     Whether Trilegiant failed to obtain authorization in writing from Plaintiff and Class members to assess automatic monthly charges on their credit cards;

(h)     Whether Plaintiff and Class members' credit, debit, and/or charge information was wrongfully accessed or caused to be accessed by a party who was not authorized to access Plaintiff's and Class members' private credit, debit, or charge card information;

(i)     Whether the transmission of Plaintiff's and Class members' private credit or debit card information between Trilegiant and the E-Merchant Defendants over the Internet was in violation of the Electronic Communications Privacy Act, 18 U.S.C.§ 2510, *et seq.*;

(j)     Whether Defendants' marketing scheme to enroll consumers into the Membership Programs without their knowledge and assess monthly fees on the consumers' credit card violated the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a, *et seq.*;

61

(k)   Whether the partnership agreement between Trilegiant and the E-Merchant Defendants, pursuant to which Trilegiant obtained Plaintiff's and Class members' credit card information, is fraudulent;

(l)   Whether the E-Merchant Defendants aided and abetted the fraudulent scheme;

(m)   Whether the Defendant Credit Card Companies aided and abetted the fraudulent scheme;

(n)   Whether treble damages should be awarded to Plaintiff and Class members;

(o)   Whether Trilegiant is in violation of the $14.5 million settlement agreement with 16 state attorneys general executed on December 12, 2006;

(p)   Whether Defendants were unjustly enriched at the expense of Plaintiff and Class members; and

(q)   Whether Plaintiff and Class members are entitled to injunctive and/or declaratory relief.

132.   Typicality Under Rule 23(a)(3):  The named Plaintiff's claims are typical of, and not antagonistic to, the claims of the members of the Classes. Plaintiff and the members of the Classes he seeks to represent have been deceived and damaged by Defendants' unlawful, deceptive, and fraudulent conduct.

133.   Adequacy Of Representation Under Rule 23(a)(4):  Plaintiff will fairly and adequately protect the interests of the Classes, and the representative

62

Plaintiff's interests are coincident with and not antagonistic to those of the other Class members he seeks to represent. Plaintiff has retained competent counsel to represent him and the Classes.

134.   The Classes Can Be Properly Maintained Under Rules 23(b)(1)(A) and (B): Prosecuting separate actions by or against individual Class members would create a risk of (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Classes; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

135.   The Classes Can Be Properly Maintained Under Rule 23(b)(3): Questions of law common to the members of the Classes predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Individual litigation of the claims of all Class members is impracticable because the cost of litigation would be prohibitively expensive for each Class member and would impose an immense burden upon the courts. The conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint, presents fewer management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all Class members.

## COUNT I
### (Violations of Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c) – Against All Defendants)

136.   Plaintiff incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

137.   This Count I is brought by Plaintiff on behalf of himself and the RICO Class against all Defendants.

### The RICO Enterprise

138.   Defendants' conduct resulted in the formation of an association-in-fact RICO enterprise consisting of Trilegiant, the E-Merchant Defendants, and the Defendant Credit Card Companies.  This association-in-fact enterprise was formed for the common purpose of making enormous illicit profits by fraudulently marketing and selling the Membership Programs to consumers, including Plaintiff and the Class members, and charging recurring monthly fees without proper consent of the consumers.  All Defendants not in privity with a Class member aided and abetted those Defendants that are in privity with a given Class member.

139.   Each member of the RICO Enterprise can be viewed as a leg of a stool, and without one leg, the stool would topple.  Trilegiant and Affinion, with the approval of Apollo, offer the Membership Programs, conceived the scam and how to implement it.  To do so, Trilegiant requires the participation of the E-Merchant Defendants and the Defendant Credit Card Companies.

140.   Pursuant to the RICO enterprise, Trilegiant/Affinion/Apollo, the E-Merchant Defendants and Defendant Credit Card Companies, each receive enormous profits from their implementation of the fraudulent scheme.  The

64

Defendant Credit Card Companies do not report on each other's involvement in the fraudulent scheme, in violation of credit card companies' merchant rules.

141.    The important decisions regarding Trilegiant and Affinion's business operations are controlled by Apollo, which owns close to 70% of Affinion's common stock.  With the approval of Apollo, Trilegiant and the E-Merchant Defendants are contractually associated through a partnership agreement, under which Trilegiant was granted full access to the E-Merchant Defendants' checkout process in order to initiate the scam.  Trilegiant was also given access to consumers' credit or debit card information that remained on file with the E-Merchant Defendants, while the E-Merchant Defendants are given a substantial portion of the revenue generated by fraudulently charging consumers monthly membership fees without their proper consent.  They, in turn, depended entirely upon the cooperation of the Defendant Credit Card Companies that issued these credit or debit cards to extract the monthly credit card payments.  As such, the Transaction, Defendant, and Trilegiant Enterprises are controlled, managed and directed by all Defendants and unnamed co-conspirators.

142.    At all relevant times hereto, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).  Each Defendant is legally distinct from the RICO Enterprise.

143.    Each Defendant has a legal existence separate from its participation in the RICO Enterprise's racketeering activity.  In addition to their illegal acts of racketeering, Trilegiant and Affinion conduct legitimate business of selling the Membership Programs through lawful means.  As a large hedge fund firm with

numerous investments, Apollo also conducts legitimate business apart from its racketeering activity in the RICO Enterprise.  Each of the E-Merchant Defendants is also engaged in lawful business activity of selling goods over the Internet. Likewise, each of the Defendant Credit Card Companies is engaged in a lawful business activity of extending credit to millions of consumers through the United States.

144.    The RICO Enterprise has been of a long-running, continuous nature and will continue to operate into the future unless the relief sought herein is granted.

145.    At all relevant times, the RICO Enterprise was engaged in, and the racketeering activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

<u>Racketeering Activity</u>

146.    Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in predicate acts that constitute violations of the following statutes:  (1) 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1344 (bank fraud).

147.    Trilegiant and Affinion further engaged in "racketeering activity" by breaching (1) the settlement agreement they reached with 16 state attorneys general in December 2006, and (2) the settlement agreement they reached with former New York Attorney General Andrew M. Cuomo, regarding their fraudulent marketing practices to tap consumers' credit cards without their authorization.

148. Each Defendant willfully engaged in a scheme to defraud Plaintiff and Class members by:

a. Intentionally concealing that Plaintiff and Class members have been enrolled in Trilegiant Membership Programs, even though they knew that Plaintiff and Class members were unaware of the alleged enrollment;

b. Entering into a partnership agreement, and intentionally concealing this contractual arrangement, under which Trilegiant unlawfully gained access to the consumers' credit card information from the E-Merchant Defendants, without first obtaining proper authorization from consumers;

c. Intentionally concealing that Trilegiant automatically charges the consumers' credit card on a monthly basis without first obtaining their proper authorization; and

d. Intentionally misrepresenting its authority to charge the consumers' bank and credit card accounts to the banks that issued the consumers' credit or debit cards.

149. Defendants repeatedly used interstate wire and mail communications for the purpose of executing and furthering such scheme to defraud Plaintiff and other Class members, including, *inter alia*:

a. Electronic, mail and/or telephone communications between Trilegiant/Affinion and the E-Merchant Defendants discussing the details of their partnership agreement to allow Trilegiant to market its

67

Membership Programs in exchange for a portion of the revenue generated therefrom;

b.    Thousands of electronic, mail and/or telephone communications between Trilegiant and the E-Merchant Defendants asking for and receiving Plaintiff's and Class members' credit or debit card information;

c.    Thousands of electronic and mail communications between Trilegiant and Plaintiff and Class members regarding Trilegiant's Membership Program offers;

d.    Thousands of transmissions of monthly unauthorized charges to Plaintiff's and Class members' credit or debit card accounts for Membership Programs;

e.    Thousands of electronic, mail and/or telephone communications between Trilegiant and Plaintiff and Class members consisting of numerous complaints regarding unauthorized enrollment into, and charges for, Trilegiant's Membership Programs;

f.    Thousands of electronic, mail and/or telephone communications between the E-Merchant Defendants, Plaintiff and Class members consisting of numerous complaints regarding unauthorized transfer of confidential billing information to Trilegiant;

g.    Thousands of electronic, mail and/or telephone communications between credit card companies, including the Defendant Credit Card Companies, and Plaintiff and Class members consisting of

68

numerous complaints regarding unauthorized charges on Plaintiff's and Class members' accounts for the Membership Programs processed by the credit card companies, including the Defendant Credit Card Companies;

h.      Thousands of electronic or mail transmissions of credit or debit card statements to Plaintiff and Class members containing the fraudulent charges, including, *inter alia*; 19 charges of $11.99 against Plaintiff's Chase Master Card with transaction descriptions of TLG*LIVWEL between March 2009 and September 2010.

i.      Thousands of electronic, mail and/or telephone communications between Trilegiant and the Defendant Credit Card Companies regarding processing of monthly unauthorized charges on Plaintiff's and Class members' credit or debit cards;

j.      Thousands of electronic, mail and/or telephone communications between Trilegiant and Apollo regarding the business operations of Trilegiant, including its scheme to impose unauthorized charges on Plaintiff's and Class members' credit or debit cards;

k.      Thousands of electronic, mail and/or telephone communications between Trilegiant and Plaintiff and Class members regarding cancellation of their inadvertent enrollment into the Membership Programs; and

l.      Thousands of electronic, mail and/or telephone communications
        among Trilegiant personnel regarding how to respond to consumer
        complaints and/or requests for cancellation of the Membership
        Programs to minimize the amount of refund.

150.    Each of the predicate acts described above occurred, and continue
to occur, every time a Class member was (and is) scammed by the Enterprise.

151.    Additionally, such scheme to defraud enabled Defendants to
unlawfully obtain enormous amount of funds under the custody or control of the
banks that authorized the recurring credit or debit card charges.  Each time
Trilegiant assessed a monthly charge to millions of unwitting consumers
pursuant to its fraudulent marketing scheme that resulted in its attainment of the
consumers' credit card information without proper consent, Defendants
committed bank fraud within the meaning of 18 U.S.C. § 1344.

### Ongoing Pattern of Racketeering Activity

152.    Within at least the four years prior to filing this action, Defendants
knowingly, intentionally, and/or recklessly engaged in an ongoing, open-ended
pattern of racketeering activity by committing millions of predicate acts of wire,
mail, and bank fraud, by knowingly and intentionally assessing, without
authorization, monthly charges to Plaintiff's and other Class members' credit
cards as part of their fraudulent marketing scheme described herein.

153.    The racketeering activity was and is related by virtue of common
participants, common victims (Plaintiff and members of the Class), a common
structure and method of commission, a common purpose, and a common result

70

of enrolling and charging consumers for unknown and unwanted Membership Programs, thereby defrauding Plaintiff and Class members of significant monies and unjustly enriching Defendants and their collaborators.

## Injury to Plaintiff and Class Members in Their Business or Property by Reason of the Pattern of Racketeering Activity

154. As a direct and proximate result of Defendants' ongoing pattern of racketeering activity, Plaintiff and Class members have suffered, and continue to suffer, repeated, ongoing injury by virtue of Defendants' unauthorized assessment of monthly fees on Plaintiff's and Class members' credit cards.

155. But for Defendants' scheme to defraud Plaintiff and Class members by enrolling them into Trilegiant Membership Programs without their knowledge and assessing monthly charges to their credit cards without first obtaining proper authorization from Plaintiff and Class members, Plaintiff and Class members would not have been injured.

156. Plaintiff and Class members were unaware of, much less made use of, the services purportedly provided by these Membership Programs.

157. Plaintiff and Class members are direct victims of Defendants' wrongful and unlawful conduct. Without authorization, Defendants withdrew monies from Plaintiff's and Class members' banks and credit card accounts on an ongoing basis.

158. As the direct victims of Defendants' wrongful and unlawful conduct, Plaintiff and Class members have been injured in an amount according to proof. Damages will be calculated with greater accuracy according to information in

71

Defendants' records. Because the information necessary to calculate damages is contained in Defendants' records, the Court will not need to adopt complicated rules apportioning damages in order to obviate multiple recoveries. Plaintiff will seek leave of Court to amend this Complaint to set forth the exact amount thereof when the same is ascertained.

159.   The pattern of racketeering activity, as described herein, is continuous, ongoing, and will continue unless Defendants are enjoined from continuing these racketeering practices. Trilegiant consistently demonstrated its unwillingness to discontinue the illegal practices described herein, and continues its pattern of racketeering as of this moment.

160.   As a direct and proximate result of the racketeering activities of Defendants as described herein, Plaintiff and Class members are entitled to recover treble damages for the injuries they have sustained, according to proof, restitution, as well as costs of suit and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

161.   As a direct and proximate result of the racketeering activities of Defendants as described herein, Plaintiff and Class members are entitled to an Order, pursuant to 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in the unlawful conduct in which the RICO Enterprise has engaged.

162.   By virtue of their violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and Class members for three times the

damages that Plaintiff and Class members suffered as a result of Defendants' scheme to defraud consumers.

## COUNT II
### (Violations of Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d) – Against All Defendants)

163. Plaintiff incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

164. This Count II is brought by Plaintiff, on behalf of himself and the RICO Class against all Defendants.

165. In violation of 18 U.S.C. § 1962(d), Defendants agreed with each other to enter into a conspiracy to, and did, in fact, conduct and participate in the affairs of the RICO Enterprise, directly or indirectly, through a pattern of racketeering activity, which included the repeated acts of mail fraud, wire fraud, and bank fraud as alleged above.

166. In furtherance of this conspiracy, Defendants committed numerous overt acts as alleged above in the pattern of racketeering described above, including, but not limited to, entering into partnership agreements which provided the structure, mechanism, and strong financial incentive to carry out the scheme to defraud Plaintiff and Class members of monthly fees by surreptitiously enrolling them in the Membership Programs.

167. As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. § 1962(d), Plaintiff and Class members have been injured in their business and property within the

73

meaning 18 U.S.C. § 1964(c), and are entitled to recover treble damages, together with the costs of this lawsuit, expenses and reasonable attorneys' fees.

## COUNT III
### (Aiding and Abetting Violations of RICO, §§ 1961-1968 – Against Defendant Credit Card Companies)

168.    Plaintiff incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

169.    This Count III is brought by Plaintiff, on behalf of himself and the RICO Class against the Defendant Credit Card Companies.

170.    The Defendant Credit Card Companies aided and abetted Trilegiant and Affinion in violating, and conspiring to violate, RICO, 18 U.S.C. §§ 1961-1968.

171.    Without the Defendant Credit Card Companies' continued cooperation by continually processing the recurring Trilegiant credit card charges, Trilegiant and the E-Merchant Defendants could not accomplish the fraudulent marketing scheme to enroll consumers in the Membership Programs without their knowledge or consent.

172.    The Defendant Credit Card Companies aided and abetted Trilegiant and the E-Merchant Defendants in their repeated commission of mail, wire, and bank frauds, with full knowledge that the consumers never provided their confidential billing information directly to Trilegiant, and never provided informed consent to Trilegiant to charge a monthly fee on their credit cards.

## COUNT IV

74

(Aiding and Abetting Commissions of Mail Fraud, 18 U.S.C. § 1341, Wire Fraud, 18 U.S.C. § 1343, and Bank Fraud, 18 U.S.C. § 1344 – Against Defendant Credit Card Companies)

173.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

174.    This Count IV is brought by Plaintiff, on behalf of himself and the RICO Class against the Defendant Credit Card Companies.

175.    The Defendant Credit Card Companies aided and abetted Trilegiant and Affinion in violating, and conspiring to violate, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1344 (bank fraud).

176.    Without the Defendant Credit Card Companies' continued cooperation in processing the recurring Trilegiant credit card charges, Trilegiant and the E-Merchant Defendants could not accomplish the fraudulent marketing scheme to enroll consumers in the Membership Programs without their knowledge or consent.

177.    The Defendant Credit Card Companies aided and abetted Trilegiant and the E-Merchant Defendants in their repeated commission of mail, wire, and bank frauds with full knowledge that the consumers never provided their confidential billing information directly to Trilegiant, and never provided informed consent to Trilegiant to charge a monthly fee on their credit cards.

## COUNT V
(Violations of Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* – Against Trilegiant, Affinion, and E-Merchant Defendants)

178.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

179. This Count V is brought by Plaintiff, on behalf of himself and the ECPA Class against Trilegiant, Affinion, and the E-Merchant Defendants.

180. The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2510(1)(a).

181. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

182. "Intercept" means the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

183. The transmission over the Internet of the confidential credit or debit card account information to various e-merchants, including the E-Merchant Defendants, by Plaintiff and Class members constitutes "electronic communications" within the meaning of 18 U.S.C. § 2510(12). The transmission is a private communication among these e-merchants and Plaintiff and Class members, made for the sole purpose of purchasing the e-merchants' products and/or services that did not include Trilegiant's Membership Programs.

184. Without prior notice to Plaintiff and Class members and in furtherance of their fraudulent marketing scheme to enroll and charge unwitting consumers for the Membership Programs as alleged in this Complaint, Trilegiant

76

entered into a partnership agreement with the E-Merchant Defendants to intentionally intercept, and did intercept, Plaintiff's and Class members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, in violation of 18 U.S.C. § 2510(l)(a).

185. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class members are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual and punitive damages, reasonable attorneys' fees and other litigation costs, and Defendants' profits obtained from the above-described violations.

## COUNT VI

**(Aiding and Abetting Violations of Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* – Against Defendant Credit Card Companies)**

186.    Plaintiff incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

187.    This Count VI is brought by Plaintiff, on behalf of himself and the ECPA Class against the Defendant Credit Card Companies.

188.    The Defendant Credit Card Companies aided and abetted Trilegiant and Affinion in violating, and conspiring to violate, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*

189.    Without the Defendant Credit Card Companies' continued cooperation in processing the recurring Trilegiant credit card charges, Trilegiant and the E-Merchant Defendants could not accomplish the fraudulent marketing scheme to enroll consumers in Membership Programs without their knowledge or consent.

190.    The Defendant Credit Card Companies aided and abetted Trilegiant and the E-Merchant Defendants in their intentional interception of Plaintiff's and Class members' confidential credit card information by means of electronic devices, including, but not limited to, their computers, with full knowledge that the consumers never provided their confidential billing information directly to Trilegiant, and never provided informed consent to Trilegiant to charge a monthly fee on their credit cards.

## COUNT VII

(Violation of Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a, *et seq.* –
Against Trilegiant, Affinion, Apollo, And The E-Merchant Defendants)[18]

191.   Plaintiff incorporates by reference the allegations of all prior

paragraphs as though fully set forth herein.

192.   This Count VII is brought by Plaintiff, on behalf of himself and the

State Law Consumer Fraud Class against Trilegiant, Affinion, Apollo, and the E-

Merchant Defendants.

193.   At all times relevant hereto, Plaintiff and Class members were

"persons" within the meaning of CUTPA.

194.   Defendants' marketing and sale of the Membership Programs as

described herein is an unfair and deceptive act and practice in violation of C.G.S.

§ 42-110b(a), including, *inter alia*:

a.   Representing the Membership Programs as part of the overall
     transaction with the E-Merchant Defendants, when in fact they are
     separate financial transactions with Trilegiant;

b.   Failing to disclose that Trilegiant automatically charges monthly
     assessments to Plaintiff's and Class members' credit and debit
     cards, except in an exceedingly fine print;

---

[18] Connecticut law applies to Trilegiant and Affinion, as they are incorporated under the laws of the State of Connecticut and conduct substantial business there affecting Connecticut consumers. In the alternative, claims are brought under the consumer protection statute of Illinois. *See* 815 Ill. Comp. Stat. 505/2 and 815 Ill. Comp. Stat. 510/2.

c.    Failing to disclose that the E-Merchant Defendants have a strong
      financial incentive to share, without proper consent, Plaintiff's and
      Class members' credit card information with Trilegiant, and that
      these E-Merchants do share the credit card information with
      Trilegiant pursuant to a partnership agreement; and

d.    Repeatedly processing fraudulent, unauthorized charges on
      Plaintiff's and Class members' credit or debit cards with knowledge
      that these charges are in clear violation of the credit card companies'
      merchant rules.

195.    As a result of Defendants' fraudulent and unfair business practices,
Plaintiff and other Class members have suffered ascertainable losses of money
or property within the meaning of C.G.S. § 42-110g(a) and have been damaged by
Defendants' unlawful acts.

196.    The conduct of the Defendants alleged in this Count was done in the
conduct of the Defendants' primary trade and commerce.

197.    The conduct of the Defendants alleged in this Count was done with a
reckless indifference to the rights of the Plaintiff and the Class members or was
an intentional and wonton violation of those rights.

198.    Defendants' fraudulent and deceptive acts and practices present an
ongoing threat and likelihood of deception to members of the public and
constitute a fraud upon the members of the public, as well as unfair, unlawful and
deceptive acts, in violation of CUTPA.

199.    Defendants engaged in the unfair or deceptive acts or practices

described herein with intent that others rely upon their concealment, suppression

and/or omission of material facts.

200.    As a direct and proximate result of the foregoing acts and/or

omissions of Defendants, Plaintiff and Class members were damaged, in an

amount to be determined at trial.

<div align="center">

**COUNT VIII**

**(Aiding and Abetting Violation of and Conspiracy to Violate Connecticut Unfair
Trade Practices Act, C.G.S. § 42-110a, *et seq*.  – Against The Defendant Credit
Card Companies)**

</div>

201.    Plaintiff incorporates by reference the allegations of all prior

paragraphs as though fully set forth herein.

202.    This Count VIII is brought by Plaintiff, on behalf of himself and the

State Law Consumer Fraud Class against the Defendant Credit Card Companies.

203.    The Defendant Credit Card Companies aided and abetted and

conspired with Trilegiant and Affinion in violating CUTPA.

204.    Without the Defendant Credit Card Companies' continued

cooperation in processing the recurring Trilegiant credit card charges, Trilegiant

and the E-Merchant Defendants could not accomplish the fraudulent marketing

scheme to enroll consumers in the Membership Programs without their

knowledge or consent.

205.    The Defendant Credit Card Companies aided and abetted Trilegiant

and the E-Merchant Defendants to commit unfair and deceptive acts, as

described herein, with full knowledge that the consumers never provided their

<div align="center">81</div>

confidential billing information directly to Trilegiant, and never provided informed consent to Trilegiant to charge a monthly fee on their credit cards.

## COUNT IX
### (Violation of California Business and Professional Code §§ 17602 – Against Trilegiant, Affinion, Apollo, and the E-Merchant Defendants)

206.   Plaintiff incorporates by reference the allegations of all prior paragraphs as though fully set forth herein.

207.   This Count IX is brought by Plaintiff, on behalf of himself and the California Class against Trilegiant, Affinion, Apollo, and the E-Merchant Defendants.

208.   At all times relevant hereto, Plaintiff and Class members were "consumer[s]" within the meaning of Cal. Bus. & Prof. Code § 17601.

209.   Defendants' marketing and sale of the Membership Programs as described herein constituted a violation of Cal. Bus. & Prof. Code § 17602, because Defendants:

    a.    Failed to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled;

    b.    Charged the consumer's credit or debit card or the consumer's account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms; and

c.      Failed to provide an acknowledgment that includes the automatic

renewal or continuous service offer terms, cancellation policy, and

information regarding how to cancel in a manner that is capable of

being retained by the consumer.

210.    As a direct and proximate result of the foregoing acts and/or

omissions of Defendants, Plaintiff and Class members were damaged in an

amount to be determined at trial.

<div align="center">

### COUNT X
(Unjust Enrichment – Against All Defendants)

</div>

211.    Plaintiff incorporates by reference the allegations of all prior

paragraphs as though fully set forth herein.

212.    This Count X is brought by Plaintiff, on behalf of himself and the

Unjust Enrichment Class against all Defendants.

213.    As a result of Defendants' fraudulent, deceptive, and unlawful

conduct, Plaintiff and Class members have conferred benefits upon Defendants

in the form of recurring, monthly payment for Defendants' Membership Programs.

214.    Defendants were at all times aware that the benefits conferred upon

them by Plaintiff and Class members were the result of Defendants' fraudulent,

deceptive, and wrongful conduct.

215.    Allowing Defendants to retain these unjust profits and other benefits

would offend traditional notice of justice and fair play.  Under these

circumstances, it would be inequitable for Defendants to retain the benefits and

allowing them to do so would induce companies to fraudulently conceal, mislead,

<div align="center">

83

</div>

and/or misrepresent key characteristics and obligations of their products in order to increase sales and profit.

216.   Plaintiff, on behalf of himself and all others similarly situated, seek restitution from Defendants and an Order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     For an order certifying this action as a class action on behalf of the Classes described above, appointing Plaintiff as the representative of the Classes, and designating Plaintiff's counsel as counsel for the Classes;

B.     For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and members of the Classes;

C.     For damages according to proof;

D.     For an award of treble damages where permitted under applicable law;

E.     For an award of punitive damages where permitted under applicable law;

F.     For preliminary and permanent injunctive relief, including an injunction prohibiting Defendants from any further engagement in the fraudulent marketing scheme to enroll consumers into the Membership Programs and charge a monthly fee without authorization;

84

G.     For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.     For costs of suit herein incurred;

I.     For both pre- and post-judgment interest on any amounts awarded; and

J.     For such other and further relief as the Court may deem proper.

Dated: December 5, 2012

/s/ Karen M. Leser-Grenon
James E. Miller (ct21560)
Karen M. Leser-Grenon (ct23587)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone:  (860) 526-1100
Facsimile:  (860) 526-1120
Email: jmiller@sfmslaw.com
        kleser@sfmslaw.com

Jeffrey A. Leon
Jamie E. Weiss
Complex Litigation Group LLC
513 Central Avenue, Suite 300
Highland Park, IL 60035
Telephone: (847) 433-4500
Facsimile:  (847) 433-2500
Email: jeff@complexlitgroup.com
        jamie@complexlitgroup.com

Richard J. Burke
Complex Litigation Group LLC
1010 Market Street, Suite 134
St. Louis, MO 63101
Telephone: (847) 433-4500
Email: Rich@ComplexLitGroup.com

Robert J. Axelrod
Jay Douglas Dean
Pomerantz Grossman Hufford Dahlstrom & Gross LLP
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: rjaxelrod@pomlaw.com
        jddean@pomlaw.com

David A Slossberg  (ct 13116)
HURWITZ, SAGARIN, SLOSSBERG & KNUFF, LLC
147 North Broad Street
Milford, CT 06460
Telephone: (203) 877-8000

Facsimile: (203) 878-9800
Email: dslossberg@hssklaw.com

James C. Shah
Nathan C. Zipperian
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: jshah@sfmslaw.com
        nzipperian@sfmslaw.com

Rose F. Luzon
Shepherd, Finkelman, Miller & Shah, LLP
401 West A Street, Suite 2350
San Diego, CA  92101
Telephone:  (619) 235-2416
Facsimile:  (619) 234-7334
Email: rluzon@sfmslaw.com

David Pastor
Pastor Law Office, LLP
63 Atlantic Avenue, Third Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
Email: dpastor@pastorlawoffice.com

Kenneth G. Gilman
Gilman Law LLP
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, FL 34134
Telephone: (239) 221-8301
Facsimile: (239) 676-8224
Email: kgilman@gilmanpastor.com

David A. Burkhalter, II
Burkhalter, Rayson & Associates, P.C.
P.O. Box 2777
Knoxville, TN 37901
Telephone: (865) 524-4974
Facsimile: (865) 524-0172
Email: david@burkhalterrayson.com

James E. Cecchi
Carella, Byrne, Cecchi, Olstein, Brody & Agnello
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744
Email: jcecchi@carellabyrne.com

Jonathan Shub
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: 215-564-2300
Facsimile: 215-851-8029
Email: jshub@seegerweiss.com

Andrew P. Bleiman
2 North LaSalle Street, Suite 1200
Chicago, IL 60602
Telephone: 312-206-5162

*Attorneys for Plaintiff and the Proposed Class*